Hemphill, Cu. J.
This case was argued and submitted upon the same statement of facts as the suit in which the present appellant prosecuted an appeal from a judgment against him in favor of Sam Houston; which judgment was affirmed by the court. (4 Tex. R., 433.)
Both parties claim through John Iams, sen. Appellant claimed the land by purchase from John Iams, jun., and Ruth Iams, who, he alleges, are the only legitimate heirs of John Iams, sen., and he contends that the plaintiffs in this suit in the court helow, who are appellees im this court, are the illegitimate children of the said John Iams, sen., and Tabitha, now Tabitlia Harris, and incapable of succeeding as heirs of the said John Iams, sen.
*85 Tiie legitimacy of tlie appellees and their capacity to take as heirs of their reputed father was settled by the decision in the case of Houston and this appellant in establishing the status of their mother to be the wife of the said John lams, sen.
Tlie statement of facts shows that John lams, jan., and Euth lams are the children of the said John, sen., by another mother, born in the State of Ohio, and that their father was lawfully married to their mother. John and Eutli are, then, the half brother and sister of the appellees; and the appellant claims all the title that accrued to them as heirs to their father. As to John lams, jun., there can bo no sort of doubt but lie is joint heir with the plaintiffs, as it is in evidence that lie came to the country with his father in 1822, and was a member of ills family at the date of the grant from the government of Mexico' to his father for the land now in controversy. But it is different with Euth. It is in evidence that she remained in Ohio when her father left in 1818, and never came to Tekas; and that she sold to the appellant in 1840. The headlight of her father was obtained in 1824; and he died in 1827, and the question is whether she had any right, as heir to her father, to convey, in 1840, when she conveyed to the appellant.
The rights of foreigners, especially of the transient class, and of foreign heirs in relation to lauded property in Spain, are not very easily to be understood.. In Spain foreigners are divided into two classes, the domiciliated and the transient, and there is an important difference between the rights, duties, and obligations of the two classes.
There are various modes by which a foreigner may become or be regarded as avecindado, or domiciliated; as, for instance, by naturalization ; by being born in the kingdom ; by being converted thereto the holy Catholic faith; by establishing a domicile, obtaining the right of residence in some settlement, marrying a native woman, and domiciliating himself in tlie kingdom ; and among other inodes of domiciliating himself is'that of attaching himself to the soil by purchasing and acquiring real property and possessions. Domiciliation is, in most respects, equivalent to naturalization. The domiciliated foreigner is regarded as a subject; and as such he must take the oatli of. allegiance, renouncing foreign protection and any relation or civil subjection to his own couutry. (L. 3,- Tit. 11, Book 6, Hov. Eec.) I-Iis rights can be defined without difficulty. He is in tlie condition of a native citizen, and is, as a general rule, entitled to the same rights and to the like charges and obligations.
A transient foreigner is defined to be one who visits tlie country without the intention of remaining; and his rights, especially with reference to real property, are not so easily comprehended. He is exempted, from some of tlie charges to which tiie domiciliated foreigner, in the capacity of a citizen, is subjected, but lie labors under tlie most onerous restrictions. He cannot sell goods by retail; nor can lie engage in the exercise of any liberal art or mechanical employment. He cannot employ himself as a banker, shopkeeper, carpenter, wigmaker, tailor, shoemaker, architect, painter, or surgeon, veterinary or otherwise, nor act even as a servant to a Spanish subject, without express license from the king; and if he attempt tlie exercise of any of these employments without domiciliating himself and taking the oatli of fidelity, he was liable to banishment in fifteen days from the court, and in two months from the kingdom. (Art. G and 7, L. 9, Tit. XI, Book G, Uov. Eec.) But a foreigner of the transient class majr sell goods by wholesale, or act as factor charged with certain affairs, or in tlie prosecution of suits in relation to these and other matters. (Diccionario of Escrielie, Yerbo ExtbANG-ERO.)
From a review of the above it appears that the acquisition of real property and possessions is a badge, or rather conclusive evidence, of domiciliation, or its equivalent, naturalization. The acquisition of such property is regarded as fixing tlie foreigner to tlie soil. He who, says the law, se anaiga comprando y adquiriendo bienes raíces y possessiones, is regarded as domiciliated. But notwithstanding such is tlie law, and it is so stated by Escrielie in his *86 dictionary, yet, according to this author, the transient foreigner is also entitled to hold and possess real property. How a transient foreigner can acquire landed property when the very possession of such property impresses upon him, by law, the character of domiciliation, is, to say the least, not very comprehensible.
Transient foreigners, says Escriche, are subject to the laws for contracts made or crimes committed' in Spanish territory, and also with respect to real property which they shall possess in the same. And, to support this statement, lie refers to L. 13, Tit. 1, Part 1; Inducción de la ley 15, Tit. 14, Part 3, Ciro, de 23 Aug., de 1771; Ced. de 24 de Oct., de 1782; L. S, Tit. 36, Lib. 12, Nov. Bee. y nota 12, Tit. 11, Lib. C, Nov. Bee. I have examined all these laws, with the exception of the circular of the 23d August, 1771, which is not accessible, and in neither of the others is there any reference to the rights of transient foreigners to hold real property in Spain. Unless the statement be founded on this circular, it is not supported so far as it relates to the real property of transient foreigners in Spain by the authorities cited.
It is also said by Escriche that a foreigner, whether transient or domiciliated, can dispose of his property freely by contract inter vivos or by last will, as well in favor of foreigners as of natives, and, if he shall die without a will, his property shall not bo confiscated, but shall be delivered to his heirs though they may be foreigners, and that the right aubana (that is, escheat, where the heirs are aliens) does not exist in Spain. If this be the law — and Escriche is very high authority — the right of a foreign hern to succeed to real property in Spain cannot well be questioned.
The state of the law then appears to be this, that a person prohibited from engaging in the exercise of any liberal art, mechanical- employment, or even servile office, (with some special exceptions pointed out by law,) and who is subject to banishment if lie attempts the exercise of any of these employments without taking the oath of fidelity, can acquire for himself, and transmit by inheritance to an heir in a foreign country, landed property, or that very species of property the acquisition of which, by law, fixes upon him the character of domiciliation and all the rights and duties of a resident subject. This might be intelligible if all the laws and their received construction were before us. As it stands, it is incomprehensible. What has been said in reference to the prohibition against transient foreigners exercising liberal or mechanical arts or employments, has reference to' the laws as they existed previous to 1837. Transient foreigners can now engage in these employments on license obtained from the political chief and payment of a subsidy or contribution. (Escriche, Verbo Extrangero.) But, without reference to the laws of Spain, let us recur to the laws of the Indies, and of the country at the date of the grant of the land in controversy, and of the death of the intestate; for it is by these that the right of the claimant must be determined.
In the case of Holliman v. Peebles, (1 Tex. B.,) the laws of the Indies relative to the right of aliens in real property were examined in some detail; and such subsequent research as I have been enabled to make has not induced the change of any opinion there expressed.
These laws abound with restrictions of almost Lacedemonian rig’or against the admission of foreigners, or their trafficking in the colonies of Spain. To lie permitted to trade they were required not only to be domiciliated, but expressly naturalized, and then licensed for that purpose. The severity of the law was occasionally relaxed only to be renewed with the same if not increased harshness. Foreigners could not pass into the Indies without special license, nor could they engage in traffic until after twenty years residence, either in Spain or the Indies, having for ten years a house and real property and being married to a native woman or daughter of a foreigner born in Spain or the Indies; (L. 31, Tit., 27, Book 9, L. of' the Indies;) ail'd, in addition, this real property must amount to four thousand ducats, acquired by way of inheritance, donation, *87 purchase, or onerous title. .(L. 32, Tit. Id., Lib. Id.,) From the intimation in this last law that the real property of the foreigner may be acquired by inheritance, it has been supposed that foreigners generally can claim such inheritance whether they be resident in tlie country or elsewhere. But such a doctrine is not countenanced by the law itself. It is not treating of foreigners residing in remote countries, but of those residing in Spain, with to a great extent all the rights of a native-born subject. No doubt a domiciliated foreigner can acquire real property in any mode known to tlie law for the transfer or disposal of such property; and such is the class of foreigners to which these two laws exclusively refer.
Gamboa,-in his Commentaries on the Mining Ordinances, and whose high distinction as a jurist is universally acknowledged, in treating- of the 2d aud 16th ordinances, and the first of the old ordinances, which make it lawful for not only tlie subjects of the crown but for foreigners to search for mines, gives the following as a reason why the law of the Indies, under the title “Discovery “oí? Mines,” made no such particular mention of foreigners, viz: that their residence in those parts was specially prohibited by the municipal laws and statutes of the country, unless specially permitted under letters of naturalization ; and that consequently they could not apply themselves to the working of the minerals of (.hat country. In support of this opinion, he refers to the whole of the laws under Tit. 27, Book 9, of the Indies; aud in substance says, that, on the contrary, persons prohibited from going to or residing in tlie Indies are not at liberty to raise gold, silver, or any other metal; (L. 1, Tit. 10, Book 8; L. 6, Tit. 27, Book 9 — Laws of the Indies;) and that the ordinance of the Viceroy of Fern, authorizing foreigners to discover and possess mines, must be understood to apply to those only who have been naturalized. In reference to such foreigners who have actually applied themselves to the working of mines, though it would be unjust, says the author, to deprive them of their property, yet they should be compelled to sell their mines, and then to leave the country, and that this was the object of the Law 26, Tit. 37, Book 9, directing that justice should be done under such circumstances. But it is otherwise where such persons so possessed of a mine, which is real property, shall have been established for twenty years, or shall be married or have a family of children, or where other circumstances under which they are tolerated by the laws of the ludios enter into the case. (Vol. 1st, pp. 29, 39.)
I have made this extract from this justly celebrated commentator not with reference to the laws of the Indies on the subject of mining as affecting foreigners, for these are peculiar, but to show that foreigners were not tolerated in the Indies unless under special circumstances; and that consequently there could be, no such thing as a non-resideut foreigner owning lands or real property in the Indies. "By Law 44, Tit. 52, Book 2, Laws of tlie Indies, it is declared that the property of persons deceased in the Indies shall be delivered to legitimate applicants, with sufficient vouchers; but that the property of neither foreigners nor natives shall be delivered to foreigners. This law lias been commented on in the ease of Holliman v. Peebles, and will not be further adverted to.
It is a general rule that the immovable property of a deceased person must be disposed of according to the laws of the country in which it is situated, although tlie personal property may devolve upon the heirs according to the laws of tlie country of which tlie deceased was a member. But it is doubtful whether a foreign heir could inherit even personal property by tlie laws of the ludios. By the cédula of tlie 6th July, 1776, published in tlie city of Mexico, on tlie 8th November, 1776, it was decreed that the property of foreigners who should die in America should not for the future be sequestered, provided they had married with a Spanish or Indian woman, aud left children begotten upon them. Tlie Mexicau editor of Febrero treats this as a law which had been in force, though, under existing laws, foreigners having all the civil rights of Mexicans, except that of acquiring landed property, the editor has [11,75] no doubt that they could now dispose of their property by will, and that it would *88 not fall into the publio treasury. (Feb. Mejicano, vol. 2, p. 18, or art. 37, cap. 1, tit. 2, book 2.) If such were the law, as expressed in the cédula, and it is cited from high authority, it shows that previous to its date, the property of deceased foreigners escheated to the public treasury, and after its promulgation it would accrue to his children in the Indies, for whose benefit it seems specially to have been enacted.
But whatever may have been the law of Spain or of the Iudies, I am of opinion that, upon geueral principles pervading the law of 1823, under which this grant was made, and upon the general policy of the government in relation to the right of property in lands (granted for the purposes of colonization) at the time of the death of the intestate, an heir domiciliated out of the Republic of Mexico could acquire no right by inheritance to lands of persons dying in the province of Texas. That John'lams, the deceased intestate, would have forfeited this land liad he abandoned the country during his life is not now open to question. Such lias always been the received construction of this law. aud in repeated instances lands thus abandoned have been regranted; and such was the opinion of this court as to the legal effect of abandonment of lands granted under this law in the case of Ilollimau v. Peebles. (1 Tex. R.)
If the permanent absence of lams from the country would operate of itself a forfeiture of .the land, it is very clear that the domiciliation of the heir in a foreign country must have a like effect. Permanent absence in the claimant of lauds was, in the law of the grant, repugnant to auy property therein. It was in utter hostility to the policy of the government.
The settlement of the country was the inducement to the grant, aud the absence of the owner being in direct contravention of the object intended by the government in bestowing its bouufcy, must be fatal to the claim of the absentee, whether he bo the original grantee or heir. It is true that the law of 1823 does not declare,'in express terms, that a grantee shall not hold his land if domiciliated out of the country, or that it shall become entirely vacant, as did the national law of August, 1824, and the State law of March, 1825. But it did what is equivalent. It gave him authority, on leaving the empire, to alienate his lands. This affirmative grant of special authority, if not wholly nugatory, must operate as a negative upon any right or pretension to the laud, or to its control or disposition, subsequent to "the desertion of the country by the grantee. On any other construction the grant of power would be perfectly frivolous and unmeaning. Why grant authority to sell the lands, if the absentee could still claim dominion over them? The law was munificent in its grants. It gave property to induce settlements; aud it even permitted the colonist, on abandonment — and thus thwarting the great end of its policy — to sell the lands bestowed as an inducement to his imigration and settlement. It cannot be rationally assumed that, under the circumstances, this power to sell was idle, and that the grantee had, under his title, such power, aud could exercise that or any other power of control of land at any time, however remote from the date of his desertion and renunciation of the country. Wo are of opinion that Ruth lams had no interest in the lands in controversy'', and that the appellant can claim nothing by conveyance from her. I-Ie is entitled to the interest of John lams, jr.,'in the lands. Judgment reversed and cause remanded.
Reversed aud remanded.
Wheeler, J., not having been present at the hearing of this cause, gave no opinion.
Nora 32. — Hornsby v. Bacon, 20 T., 650; Blythe v. Easterling, 20 T., 665.