## J. SETTEGAST AND ANOTHER v. H. SCHRIMPF.

1. After a foreigner by birth has duly declared his intention for the purpose of being naturalized as a citizen, it seems that he is invested, under the laws of this State, with all the rights of citizenship except the elective franchise ; and therefore he could acquire real estate by purchase, and on his death could transmit it by descent to his children.

2. The fourteenth section of the act of January 28, 1840, regulating descents, and its re-enactment in the act of March 8, 1848, (Article 44, Paschal's Digest), demonstrate that the rule of the common law which disables an alien from casting descent on an alien has not been in force in Texas.    Sabriego v. White, 30 Texas, 576, cited on this point with approval.

3. S., a foreigner by birth, immigrated to Texas in 1851, and duly declared his intention for the purpose of becoming naturalized, but died in 1853, before the lapse of the period necessary to consummate his naturalization.    In 1868, his children, who were minors under seventeen years of age at the time of his immigration, sued as his heirs for lands purchased by him in this State, and in their petition they alleged the above stated facts, as well as their own citizenship at the institution of this suit.    The defendant demurred, and relied on the alienage of S., the plaintiffs' ancestor, and his alleged incapacity to transmit title to the plaintiffs by descent.    *Held*, that it was error to sustain the demurrer.    Yates v. Iams, 10 Texas, 168, is not analogous to the present case.

APPEAL from Harris.    Tried below before the Hon. James Masterson.

The opinion of the court supplies a lucid statement of all facts involved in the rulings made.    The plaintiffs and appellants were Joseph and Julius, the two sons of William M. Settegast, deceased.

*Henderson & Whitfield*, for the appellants.—The domicile of the ancestor of appellants was fixed by his removal from Prussia to Harris county, with his entire family.    His national character was fixed by his decla-

ration before the District Court of Harris county, and his renunciation of his allegiance to his former prince. The domicile of a party's birth remains until a new one is acquired. (*Ex parte* Blumer, 27 Texas, 734 ; Story, Conflict of Laws, 61, § 48.)

It will be observed that the father of the appellants had taken out his first papers of naturalization according to law, and died before the final papers were issued, and before the passage of the act of the thirteenth of February, 1854, the third section of which reads as follows :

"ART. 47. Any alien, being a free white person, who shall become a resident of this State, and shall, in conformity with the naturalization laws of the United, have declared his intention to become a citizen of the United States, shall have the right to acquire and hold real estate in this State, in the same manner as if he was a citizen of the United States." (Paschal's Digest.)

This act was passed only about four months after the death of appellants' ancestor, but we conceive that it established no new rule, but was simply declaratory of what the law was before its passage. The removal of appellants' ancestor to Texas with his entire family, with the *bona fide* intention of becoming a citizen of the United States, coupled with a residence in Harris county of three years prior to his death, with his declaration taken in due form of law before the District Court of Harris county, *ipso facto* constituted him and clothed him with all the rights of an American citizen, save that alone of voting.

The government of the United States, in her controversy with Austria in the Martin Koszta case, assumes this position, and maintains it now as a principle of international law.

The case at bar is a stronger one than the one cited ;

for it has all the elements of the Koszta case, and the additional one that he removed with his entire family to Texas, one of the United States, with the intention never to return ; that he was prevented by death alone from becoming a naturalized citizen of the United States.

If he was not a citizen of the United States at the time of his death, of what country was he a citizen? Was it of Prussia? Certainly not, as by his declaration to become a citizen of the United States, he had renounced particularly his allegiance to Prussia.  If not a citizen of the United States for all purposes except that of voting, he must be regarded as a cosmopolite, without the rights of and duties to any government.

Mr. Kent, in commenting on the rigorous rule of the common law against the rights of aliens, on page 23, Vol. II, says:

"The force of this rigorous doctrine of the common law is undoubtedly suspended with us, in respect to the subjects of those nations with whom we have commercial treaties, and it is justly doubted whether the common law be really so inhospitable, for it is inconsistent with the established maxims of sound policy and the social intercourse of nations.  Foreigners are admitted to the rights of citizenship with us on liberal terms; and as the law requires five, and only five, years' residence, to entitle them and their families to the benefits of naturalization, it would seem to imply a right in the meantime to the necessary use of real property ; and if it were otherwise, the means would be interdicted which are required to render five years' residence secure and comfortable."

Then we assume that the ancestor of appellants, on arriving in Harris county, in the State of Texas, with the intention of becoming a citizen of the United States,

had the undoubted right to purchase land for the purpose of a support, and for the comfort of his family.

The Supreme Court of the United States, in the case of Cross v. De Valle, 1 Wallace, page 8, says :

"That an alien may take, by deed or devise, and hold against any one but the sovereign, until office found, is a familiar principle of law, which requires no citation of authorities to establish."

The ancestor of appellants having purchased the land in controversy, took possession of it, paid for it, made valuable improvements thereon ; the title to the same was in law and equity vested in him, and he having declared his intention to become a citizen, was by that act *ipso facto* a citizen of the United States, and that act of naturalization has a "retroactive effect, so as to be deemed a waiver of all liabilities to forfeiture, and a confirmation to his former title." (*Vide* Osterman v. Baldwin, 6 Wallace, 116 ; Jackson v. Beek, 1 Johns. Cases, 401.)

We further assume that the intention of the ancestor having been established to change his former domicile by a residence of three years in Harris county, and his declaration declared before a court of competent jurisdiction, to become a citizen of the United States, and his death before he was by law permitted to take out his final papers, the law will presume that to have been done which was intended to be done, and prevented only by the act of God. The law doth not require impossibilities.

Especially will this be held to be the rule, where the contrary would work an irreparable injury to the appellants, who are now, and have been from their infancy, resident citizens of Texas, and work no injury to the appellee, nor objection by the State, which alone is interested in the property.

By the act of April 14, 1802, and the supplemental act of March 26, 1804 (Brightley's Digest, pages 34 and 35), the sixth section of the latter act reads as follows :

" When any alien, who shall have complied with the first condition specified in the first section of the said original act, and who shall have pursued the directions prescribed in the second section of the said act, may die before he is actually naturalized, the widow and the children of such alien shall be considered as citizens of the United States, and shall be entitled to all rights and privileges as such, upon taking the oath prescribed by law."

These acts taken together have been construed as prospective in their operation, and apply to subsequent as well as previous naturalization. (West v. West, 8 Paige, 433.)

Then we assume under this act that the ancestor of appellant having taken out his preliminary papers under the act, that his two sons, Joseph and Julius, being minors under twenty-one years of age at the death of their father, on arriving at twenty-one years, and taking the oath prescribed by law, *ipso facto* became citizens of the United States, and that their naturalization on arriving at their majority, had a retroactive effect, so as to be deemed a waiver of all liability of forfeiture to the State, and a confirmation of their title to the land in controversy, acquired by descent through their father and mother, under the act of March, 1848, which law they claim secures to them the land.

We have presented the foregoing views and authorities upon the assumption that William M. Settegast was not, at the time of his death, an alien, incapable in law of casting his estate upon his two minor children, residents of Texas ; but if in this we are wrong, and this court sustains the position of the court below, that

upon the facts alleged William M. Settegast was an alien, it follows that his minor children, born abroad, and who immigrated with him to the country, were also aliens, and we will now proceed to discuss the question in that view of the case.

The act to regulate the descent and distribution of intestate estates, passed March 8, 1848 (Paschal's Digest, Article 44,) reads as follows:

"In making title to land by descent it shall be no bar to a party that any ancestor through whom he derives his descent from the intestate is, or hath been, an alien, and every alien to whom any land may be devised, or may descend, shall have nine years to become a citizen of the Republic, and take possession of such land, or shall have nine years to sell the same before it shall be declared to be forfeited, or before it shall escheat to the government."

At the time of the death of Wm. M. Stettegast, in 1853, this act was in force; his heirs had his estate cast upon them by descent, immediately, whether they were alien heirs or resident heirs, and even the State could not have declared a forfeiture before the nine years elapsed.

The Legislature of Texas has never passed a law to enforce Article 13, Section 4, of the State Constitution, and as there has been no mode provided by law, no forfeiture can be declared, even by the State, against the appellants, until office found. (Hancock v. McKinney, 7 Texas, 384; Swift v. Herrera, 9 Texas, 263.)

The estate of Wm. M. Stettegast having descended and vested in his two sons, the appellants, both minors and residents of Texas, though born abroad, were, under the act of March, 1848, if they are to be regarded as aliens, entitled to take by descent from their father, an alien, within nine years, which time was prescribed

by the above statute, either to become a citizen or to dispose of the same within that time. They being minors they could neither sell nor become citizens within the time prescribed; but the title having been vested by descent, under the above statute there was no abeyance by the death of William Maria, and they now hold on the same principle as an alien purchaser holds until office found; they having no capacity in law to sell or become citizens under the naturalization laws owing to their minority.

We then assume that their title to their father's estate, under the act of 1848, if they and their father are to be regarded as aliens, is good against all persons but the State, and good as against the State, until office found, or forfeiture declared to divest the title by the State. (Sabriego v. White, 30 Texas, 576.)

In the case at bar the only defense set up by appellee was the alienage of the ancestors of appellants, through whom they claim, which, according to the decision above cited, was a plea that could not be set up by third parties, nor by the State until office found. That this position is sustained by our own courts, and by the highest judicial authority in the land, we quote the following authority to sustain the position that the court, nor no other power, can declare a forfeiture except in the manner provided by law, and as no law has been passed by the Legislature of Texas to provide for the escheat of lands for alienage, there can be no forfeiture until the State prescribes the mode and manner. That the question of alienage is one in which no private litigant has any interest, and the subject of escheats being one in which the State is entirely interested, cannot be denied for a moment.

The authorities referred to are, Craig v. Leslie, 3 Wheaton, 589 and 594; Fairfax's Devisees v. Hunter, 7

Cranch, 603; Orr v. Hodson *et al.*, 4 Wheaton, 453; Chirac v. Chirac, 2 Wheaton, 259; Ex Dem. Gouvernier's heirs v. Robinson, 11 Wheaton, 332; McCreery v. Alexander, 4 Har. & McH., 409; University v. Miller, 3 Ber., 191; Buchannon v. DeChaum, 1 Har. & Gill, 280; Sheefe v. O'Neil, 1 Mass., 256; Jinkins v. Norrell, 3 Sterr., 60; Dudley v. Grayson, 6 Monroe, 260; Jackson v. Adams, 7 Wend., 367; Bradstreet v. Supervisors, 13 Wend., 446; Scanlan v. Wright, 13 Pick., 523.

*Gray & Botts*, for the appellee.—The Constitution of the Republic, of 1836, clearly declared that "No alien shall hold land in Texas, except by titles emanating directly from the government." (Gen. Provisions, § 10.)

Although further provision was made in behalf of the alien heirs of a citizen dying intestate, none was made, or directed to be made, for the heirs of aliens— nor for an alien making a contract to purchase. The common law was, in effect, the same, as we shall hereafter show. Supposing, then, that Settegast, the ancestor, should himself have sued for a title to the land, which the law forbid his holding—which, if vested in him, would be liable to forfeiture (or if vested in his heirs would be liable to be escheated); could the court aid him to take a title? To state such a proposition seems a sufficient refutation of its soundness. The law will not aid an alien to recover that to which he can have only a defeasible title; and equity will not aid him to take a title which the law forbids him to hold. If it be otherwise, the courts of a country would recognize and enforce a claim which the laws of the country discountenance and forbid, and which would immediately be liable to be divested by the government. But the law does nothing in vain. "*Lex nil facit frustra*," is a maxim of universal observance both in law and

equity. (Orr v. Hodgson, 4 Wheat., 465; 7 Bacon Ab., Uses and Trusts, E., p. 89; Hubbard v. Goodwin, 3 Leigh, 492.)

If this view of the case, and of the rights of the appellants' ancestor, be correct, then he had no title capable of enforcement; and they could acquire no title greater or better than that he possessed at his decease; and, consequently, have none in this suit.

But, if the alien ancestor held by deed of conveyance from Schrimpf, what was the character of that title, and could he, as an alien, transmit it by descent to his children? The answer to this question does not depend on the status of the appellants as aliens or citizens. If they were aliens at the time of their father's decease, they would be incapable of taking by descent, it is true, and therefore had no title capable of enforcement by suit. This proposition is clear and undoubted at common law. But, if they were citizens, by virtue of their father's naturalization, yet they could not acquire title from an alien ancestor, because he, having no inheritable blood, could not transmit title by descent, either to citizen or alien heirs. The descent was cast, instantly on his death, in the State, and that, too, without office found, by escheat or otherwise.

The Constitution of the Republic of Texas continued the policy of the country against the holding of land titles by aliens, as has already been cited. The common law of England, introduced by statute of twentieth of January, 1840, took effect on sixteenth of March, 1840, and its principles and policy were to the same effect as that of the Constitution of the Republic. No change was made by the Constitution of 1845; but, on the contrary, by the thirteenth article of that Constitution, section three, it was distinctly provided that "all laws, and parts of laws, now in force in the Republic of

Texas, which are not repugnant to the Constitution of the United States, etc., or to the provisions of this Constitution, shall continue in force, as the laws of this State, until they shall expire by their own limitation, or shall be altered or repealed by the Legislature thereof." The next section, fourth, saved to the State "all fines, penalties, forfeitures and escheats, which have accrued to the Republic of Texas under the Constitution and laws," and directed that the Legislature should "provide a method for determining what lands may have been forfeited or escheated," to the Republic. No direction was given for determining future forfeitures and escheats of lands, but only those that may have been forfeited or escheated.

The principles, then, of the common law prevailed and governed in 1853, at the decease of appellant's ancestor; and in 1851, when it is alleged he had acquired his right, legal or equitable, unless modified by the statutes of descent and distribution of 1840 and 1848. The fourteenth section of the act of twenty-eighth of January, 1840, and the ninth section of the act of eighth of March, 1848 (Pas. Dig. Art. 44), are identical in terms. What then was the common law, and how far was it modified by these provisions?

Blackstone asserts (Book 1, p. 372), "an alien born may purchase lands or other estates, but not for his own use, for the king is thereupon entitled to them."

He also states (Vol. 2, p. 349): " Aliens also are incapable of taking by descent, or inheriting, for they are not allowed to have any inheritable blood in them; rather, indeed, upon a principle of national or civil policy, than upon reasons strictly feudal."

"As aliens cannot inherit, so far they are on a level with bastards; but as they are also disabled to hold by purchase, they are under still greater disabilities. And,

as they can neither hold by purchase, nor by inheritance, it is almost superfluous to say that they can have no heirs, since they can have nothing for an heir to inherit; but so it is expressly holden, because they have not in them any inheritable blood." See, also, the remarks following upon the effect of denization, which support the general doctrine stated. (2 Sharswood's Blackstone, pp. 249-250.)

Chancellor Kent (2 Com. 53-54) says: "An alien cannot acquire title to real estate by descent, or created by other mere operation of law. The law *quæ nihil frustra*, never casts the freehold upon an alien heir who cannot keep it. This is a well settled rule of the common law. It is understood to be the general rule, that even a natural born subject cannot take by representation from an alien, because the alien has no inheritable blood through which a title can be deduced. If an alien purchase land, or if land be devised to him, the general rule is, that in these cases he may take and hold until an inquest of office has been had; but upon his death, the land would instantly, and of necessity (as the freehold cannot be kept in abeyance), without any inquest of office, escheat and vest in the State, because he is incompetent to transmit by hereditary descent."

These quotations present the points arising in this case. (See, also, 1 Washburn on Real Property, p. 49,* or p. 63 of third edition and notes.)

It is because an alien cannot hold land that he is disabled to sue and maintain an action for land, unless he hold by title directly emanating from the government, or under peculiar circumstances by statute or treaty. (2 Spence's Eq. Jur., p. 14; 1 Bacon, Abridg. (Alien) D., p. 210; Ennor v. Franklin, 2 Brevard, 398.)

The decisions in Hardy v. De Leon, 5 Texas, 240, and

White v. Sabaiego, 23 Texas, 243, are direct to this point. They are not inconsistent with the other Texas cases, where titles had emanated directly from the government, as in Kilpatrick v. Sisneros, 23 Texas, 113, or where they had acquired title by descent or purchase before the revolution of 1836, as in Jones v. McMasters, 20 Howard, 8–20, and Sabriego v. White, 30 Texas, 576. Or, where they had acquired by purchase, and become citizens by annexation before office found, as in Osterman v. Baldwin, 6 Wallace, 116.

All these exceptional cases only establish and confirm the general rule that an alien cannot sue for land.

In order to avoid this conclusion, appellants claim, by their last amended petition, under the provisions of the treaty with Prussia of 1828, the fourteenth article of which provides, that "when on the death of any person holding real estate within the territory of the one party, such real estate would, by the laws of the land, descend on a citizen or subject of the other, were he not disqualified by alienage, such citizen or subject shall be allowed a reasonable time to sell the same and to withdraw the proceeds without molestation." (Lawrence's Wheaton on International Law, p. 164, and pp. 166, 167, and notes.)

Under the treaty they took no title, because, first, its provisions do not purport to change the law of descents in the several States, but only provides that a reasonable time shall be allowed the alien subject to sell the land and withdraw proceeds. This reasonable time has been fixed, in all other treaties containing this clause, at two years. (Law. Wheat. Int. Law, 168, in notes.)

And second, the treaty does not apply to the case of an alien ancestor holding land in Texas. It does not provide that an alien claiming or holding land can

transmit title to an alien.  If it did so provide, then it would place alien subjects on a higher and better footing than citizens.  It would enable Prussian subjects to inherit from alien ancestors, while citizens cannot. Such a result cannot be held a fair construction of its terms, nor of the intention of the parties.  It only provides that, where by law the land would descend to an alien, but for his alienage—that is, where it would descend to him were he a citizen—then he shall have reasonable time to sell and withdraw proceeds.  This we take to be clear, that the intention and meaning of the treaty was not to make a new rule of descent, but only to allow an alien to sell in cases where he would have inherited had he been a citizen.  Any other construction would be unreasonable, because it would be more favorable to aliens than to our own citizens.

Then the question arises, which we think conclusive in this case, could Settegast, the alien ancestor, transmit title by descent to heirs, either citizen or alien, by the common law, or the laws of Texas?  We submit that he could not, but that the descent was cast instantly on the State, without office found.

The following authorities sustain that position at common law:  Jackson v. Adams, 7 Wendell, 368, cited in Barrett v. Kelly, 31 Texas, 476–483; Blight v. Rochester, 7 Wheat., 535.

"The estate of which an intestate alien dies siezed, vests in the State without office found."  (Thomas v. Gray, 1 Littell, 149; Slater v. Mason, 15 Pickering, 345; Fairfax v. Hunter, 7 Cranch, 603; Montgomery v. Dorion, 7 N. H., 475; Leavy v. McCarty, 6 Peters, 102; Spratt v. Spratt, 4 Peters, 393; Moers v. White, 6 Johns. Ch., 360.)

"An alien may take land by the act of the parties, as by purchase or devise, and hold until office found;

but he cannot take by act of law as by descent, as he has no inheritable blood. An alien cannot at common law be heir to any one, nor can he transmit inheritable blood." (Smith v. Zaver, 4 Alabama, 99.)

" An alien cannot take by descent, where the ancestor dies after preliminary declaration of intention to become a citizen, but before actual naturalization." (Foss v. Crisp, 20 Pickering, 121.)

An alien female had given notice or made declaration of her intention to become a citizen under the act of 1802, and had taken the oath, but died before she was duly naturalized, and it was held that her husband, though a naturalized citizen, could not inherit through her. The court said "the husband would still be no more than a citizen, attempting to claim a freehold through an alien wife ; and still the freehold having never been in the wife, because she was always an alien, he cannot claim it through her." (McDaniel v. Richards, 1 McCord, 187.)

We call the special attention of the court to the foregoing two cases, and to the following, as being directly in point and similar to the case at bar :

"A father and his minor daughter, both aliens, came to the United States in 1820. Afterwards in the same year, the father made a declaration in the proper court of his intention of becoming a citizen, but did not report his daughter. In the next year he purchased land in the State of Indiana, and died in 1828 without being naturalized, having devised the land to his said daughter. It was held by the Supreme Court of Indiana, 'that the testator might have acquired under the statute of Indiana, by his purchase, a perfect title to the land ; but that such title could not pass by the devise to his alien daughter. Held, also, that by the law governing this case neither an alien nor any person

claiming from, through or under an alien ancestor, could acquire a title to real estate by descent.'" (Eldon v. Doe, 6 Blackford, Indiana R., 341.)

But it may be further contended that the common law rule has been modified by our statutes of descent (Section 9 of 1848, before cited), so that these appellants can claim directly from an alien ancestor. We are aware that Justice Lindsay has said, in his opinion in Sabriego v. White, 30 Texas, 588, that this provision shows "that the common law rule, that an alien cannot cast descent upon an alien, was wholly inapplicable to the Republic of Texas;" and he thinks that the decision of the case of McKinney v. Sabriego, 18 Howard, 238–239, was based on misapprehension by the Supreme Court of the United States of the laws of Texas. Now we respectfully submit that Justice Lindsay's opinion on that point was *obitur dictum.* It was not necessary to the decision, and can hardly be deemed the opinion of the court. We further submit that the misapprehension of the law was not by the Supreme Court of the United States. The point was directly before them and was necessary to their decision, and Justice Campbell's opinion was that of the court. We submit, further, that their opinion was in exact accordance with the language of the act and its intention, and in accordance with the decisions of other courts where the same statutory provision is in force. It will be observed that the language of the act is carefully guarded, that "it shall be no bar to a party that any ancestor through whom he derives his descent from the intestate is or hath been an alien." It does not say any ancestor from whom he claims, or any intestate from whom he claims, but any ancestor through whom he claims, from the intestate. Most clearly it was to preserve the policy of the law against aliens holding lands, and yet

22—XXXV

that a citizen, relative or heir, might inherit from a citizen ancestor owning land, although he might make his pedigree through a mediate alien ancestor.

The statute is nothing more than a re-enactment of the English statute of 11 and 12 William III, c. 6. It is *in totidem verbis*, the same as the act of Virginia of 1785. (Rev. Code of 1819, Descent, p. 357.) The same in force in Kentucky, which was separated from Virginia afterwards. The same in Maryland, New York and other States. Yet no such construction has ever been put on the English or American statutes as that first advanced by Justice Lindsay. In Blight's Lessee v. Rochester, before cited, which arose in Kentucky, C. J. Marshall, familiar as he was with Virginia and Kentucky law, decided directly against such a construction, without once alluding to that clause of the statute, when it was necessary that the decision should have been otherwise, if such was truly its meaning and design.

None of the cases cited allude to such a construction having been even contended for, though the statute, if it had such meaning, was directly in the way of the decisions made.

Indeed, the construction of those statutes has been directly under discussion in several cases, yet no such view has ever been taken, or advanced. (See Johnson v. Sanders, 2 Leigh, 109 ; Jackson v. Green, 7 Wendell, 333 ; Jackson v. Fitzsimmons, 10 Wendell, 1 ; Levy v. McCartee, 6 Peters, 102 ; McCreery v. Somerville, 9 Wheat., 354.)

But, aside from these views, the reasoning of the court in McKinney v. Sabriego, 18 How., 239, is so clear and convincing, that we might well rely on it alone as the true construction of that section of the Act of Descents.

The same view of it is admitted by Judge Brocken-borough, in the Circuit Court of the United States in Virginia, in Vint v. The Heirs of King, 2 Am. Law Register, 1854, p. 719.

Again, we would submit, if such were the true construction of the Act of Descents (Sec. 9) where was the necessity of a change of the law, by act of February 13, 1854? (Paschal's Dig. Arts. 45–48). This act has no retrospective effect upon the title in this case, the ancestor having died previous to its enactment. But the necessity of it, as being politic to encourage emigration, and adopt a more liberal rule for the benefit of aliens and their children, demonstrates that the law was not so understood before. This act gives rights and liabilities to aliens never before enjoyed. The third section provides expressly for just such a case as this under consideration, that an alien who shall make declaration of intention to become a citizen may acquire and hold land as a citizen. The fourth section repeals the ninth of the Act of Descents, so far as inconsistent with the new act, as it really was.

WALKER, J.—The appellants brought suit in the district court to obtain title and possession of thirty acres of land lying near the city of Houston.

They aver in their petition that their father, William M. Settegast, purchased the land in controversy from John W. Schrimpf, in his lifetime. W. M. Settegast, the father of the plaintiffs, died in 1853. Their mother had previously died, and a second mother and two sisters died about the same time their father deceased. At the death of their father they were infants of a tender age; that Schrimpf took them to his house, where they remained and grew up to manhood; that Schrimpf afterwards dying, the appellee administered

upon the estate, and that she fraudulently withholds from them the title to the lands so purchased by their father from her intestate. They further aver that their father took possession of the land after his purchase, made valuable improvements upon it, and dying, was buried on it.

The defendant pleads generally and specially, and in bar of the action set up, that William M. Settegast, at the time of his death, was an alien, and could not transmit his property by inheritance to his children. The plaintiffs amended their petition, and aver that their father came from the kingdom of Prussia in the year 1851, and settled in Harris county, in the State of Texas; that he intended to make the United States his home; that he became domiciliated; that he acquired the property in controversy by purchase; and that, so soon as he was able, he made the proper declaration before a court of record, of his intention to become a citizen of the United States, but that he died before the full period of his naturalization had elapsed. They further aver that, on attaining their majority, they became and are citizens of the United States, and of the State of Texas, residing in the county of Harris.

The amended petition was demurred to, and the court sustained the demurrer; to which exceptions were taken, and the cause is brought to this court by writ of error.

The only question, then, for our decision is, whether or not the court erred in sustaining the demurrer. In the case of Yates v. Iams, 10 Texas, 168, we have a learned exposition of the rights of foreigners, or aliens, under the laws of Spain and the Indies. This case was decided in 1853, but the facts governing it arose prior to the adoption of the common law as a rule of decision in this State; and it can only be regarded as authority

in the decision of the case at bar in so far as it illustrates the origin, growth and development of our land system, and the proverbial liberality of Texas under each of her different forms of government, in endowing all *bona fide* settlers with valuable grants of land. This liberality was extended alike to the people of every civilized nationality. The Chief Justice in his opinion quotes from Escriche to the effect that a foreigner, whether transient or domiciliated, could dispose of his property by contract *inter vivos*, or by will; and a devise could be made to foreigners or aliens, as well as to natives. So, also, if a foreigner died intestate, his property was not subject to confiscation, but descended to his right heirs, though they were aliens or foreigners; and that the right *aubana* (that is, the right of escheat) does not exist under the laws of Spain. This was certainly a much more liberal and humane method of treating the rights of foreigners than that adopted by the common law; for by common law an alien could not maintain an action to recover real property. He might acquire land, but he held it subject to the will of the government, and upon his death his land will revert to the government. (See Barrett *et al.* v. Kelly *et al.*, 31 Texas, 476.) Such is declared to be the law of Texas by the opinion delivered in the case by Chief Justice Morrill; but we think this case is in conflict with the case of Sabriego v. White, 30 Texas, 576, and also with the case of Osterman v. Baldwin, 6 Wallace, 106. In this case the court say: "A citizen of the United States, and who as such was of course, before the admission of Texas into the Union, an alien to that republic, and so, as against office found, incompetent to hold land there, became, on the admission, competent, no office having been previously found." Mr. Justice Lindsay, in his able opinion delivered in the case of

Sabriego v. White, holds that Article 44, Paschal's Digest, clearly contemplates an inquest of office before the declaration of forfeiture could be made. In the same opinion, commenting upon Article 44, Note 238, Paschal's Digest, the learned judge says:

"This provision of the law shows, beyond all controversy, that the common law rule that an alien cannot cast the descent upon an alien, was wholly inapplicable to the Republic of Texas. Hence we can see that the decision in 18 Howard's Reports was announced under a total misapprehension of the state of the law in Texas at the time the rights of the plaintiffs accrued."

But it is difficult to bring the case at bar within the precise rule of any reported case we have been able to find. We think, however, that the statutes in force at the time of the death of Wm. M. Settegast settle this question.

But, before we proceed to consider the rights of the parties under the statute law of the State, it is important to consider the main question by another and a different light. Was Wm. M. Settegast an alien, in the true sense of the term, at the time of his death? We think not. There was nothing in the laws of Texas which declared him such; but, on the other hand, he was permitted, under the the laws of the State, to exercise most of the rights of citizenship, and was, to all intents and purposes, responsible to the laws as other citizens. The Constitution of the United States reserves the right, and makes it the duty of Congress, to pass naturalization laws, and the States are inhibited the exercise of this power. A very noted case has arisen in the history of our government, in which the political power has declared what must be regarded as the condition of one similarly situated to Wm. M. Settegast at the time of his death. (See letter of Secretary Marcy, Executive Doc., first session, Thirty-third Congress.)

Martin Koszta, one of the Hungarian patriots, after the failure of the revolution of 1848, came to the United States, and in due time abjured his allegiance to the Emperor of Austria, all other sovereignties and nationalities, and avowed his purpose to become a citizen of the United States. Before he had been fully naturalized, he had occasion to travel in the East, and was found in the city of Smyrna, within the dominions of the Ottoman Empire, and was forcibly abducted, against the protest, not only of the American Minister, but of the Turkish authorities, on board an Austrian armed vessel. The United States war ship St. Louis anchored in the port of Smyrna, before the Austrian vessel had sailed ; and her commander, Capt. Ingraham, being appealed to, demanded the release of Koszta, and forced his rescue at the mouth of his cannon. The Austrian government demanded from the United States apology and reparation, which the United States firmly refused, endorsing the conduct of Capt. Ingraham, and asserting the right and duty of the United States to protect Koszta at home and abroad. Notwithstanding Austria made loud and inflammatory appeals to the different courts of Europe, the United States maintained her point, and the principle involved may be said to have fairly become one of international law. This was the case of one who was forced into exile, and was little more, at most, than a cosmopolite. He had been but a short time in the United States before he was found in another quarter of the globe, under circumstances well calculated to arouse alarm and stir up suspicion in the Austrian government.

How strongly, then, does the history of this case imply the rights of one situated as Wm. M. Settegast at the time of his death. Under this authority of the United States, we are forced to the conclusion that he

Opinion of the court.

must be regarded as having secured to himself and his children, who were minors under the age of seventeen, the right of a naturalized citizen, except so far as pertained to the exercise of the elective franchise.

But, without intending to place our decision solely upon this ground, we hold that, under the act of the twenty-eighth of January, 1840, and the substantial reenactment of the same on the eighth of March, 1848, all difficulty in the way of the title to land in William M. Settegast descending upon his death to his children had been removed. It is true the language of the act might be more plain. The act reads thus: "In making title to land by descent, it shall be no bar to a party that any ancestor through whom he derives his descent from the intestate is or has been an alien; and every alien, to whom any land may be devised or may descend, shall have nine years to become a citizen of the Republic and take possession of said land; or shall have nine years to sell the same before it shall be declared to be forfeited, or before it shall escheat to the government." This, as Mr. Justice Lindsay has said, indubitably shows that the common law rule, that an alien cannot cast descent upon an alien, was totally inapplicable to the State of Texas.

It sufficiently appears in the pleadings of this case that the plaintiffs are within the nine years limitation, and we are unable to see that there is any legal bar to their recovering in this case. The judgment in the district court is therefore reversed, and the cause remanded.

REVERSED AND REMANDED.