## TACITUS CLAY v. HEIRS OF NESTOR CLAY.

### SUPREME COURT, TYLER TERM, 1882.

*Note.*—This case has already been twice before the Supreme Court and was reported in 26 Tex., pp. 24 31, and 36 Tex., pp. 509, 34

*Trespass to Try Title—Colonization Laws—Illegal Sale.*—Upon the two former appeals of this case the court negatives the first proposition in this appeal "that the sale by Nestor Clay in 1830 was prohibited by the laws then in force, was a nullity ; passed no title to the vendee, and is no bar to a recovery by the heirs of the vendor."

*Same—Sale—Conditions Precedent—Evidence.*—Proof of a proposal to make a conditional gift, when the latter is wholly unconnected with the contract, does not support the allegation of a conditional contract of sale.

*Same—Alienage —Held,* that it must be ruled negatively, "that at the time of the sale Tacitus Clay was, and for years afterwards, continued to be an alien, incapable of taking land by purchase, and that for that reason he could not hold against the heirs of the vendor.

Appeal from Washington county.

#### STATEMENT OF THE CASE.

This is an action of trespass to try title, filed by appellees as heirs of Nestor Clay, to recover of appellant a quarter of a league of land in Washington county, known as the Hickory Point place. The case has already been twice before the Supreme Court, and its previous history will so far as reported be found in the 26 Tex., pp. 24-31, and the 35 Tex., pp. 509-34.

After the reversal of the judgment on the first appeal, the defendant amended his pleadings, and alleged that at the date of his purchase of the land, he was a citizen of Texas; that he was received and recognized as a colonist by the properly constituted authorities in 1831, and again in 1833, and that he received from the colonial government a grant of land as a colonist of Austin colony, and he annexed to his answer a copy of his application, dated June 6, 1831, and of the grant dated March 25th, 1833. That he took possession of the land purchased from Nestor Clay, and made large improvements upon it—that, at great expense, he had introduced and established upon the land in controversy, a blacksmith and a physician, besides locating upon it a store to supply the settlement with goods, drugs, medicines, arms and ammunition, to defend themselves against the Indians. Upon the second appeal, the Supreme Court took no notice of the question of alienage which had been raised by the defendant's exceptions and passed upon in the first opinion.

Upon the last trial the same questions were again litigated—the illegality of the sale of Nestor Clay, and the alienage of the defendant—but there was also brought in another issue, viz: that the sale of Nestor to Tacitus Clay was made upon the condition that he should settle upon the land and bring to Texas the mother and sister of Nestor Clay.

Plaintiffs averred that there were conditions precedent, and had not been performed.

The trial was had at the March term, 1874, and judgment rendered for the plaintiffs for the land and for the sum of $15,658 for use and occupation.

Motion for new trial overruled, and defendant appealed.

The charge of the court related to the three issues alone set forth, to wit: the illegality of the sale by Nestor Clay to the defendant, by reason of the prohibitions contained in the colonization laws, and the capacity of Nestor Clay to ratify the sale after the 26th of March, 1834; the alienage of the defendant, and the conditions upon which the sale was alleged to have been made. There were also charges upon the statute of

limitations, which, however, is not made a question on this appeal.

Upon the subject of alienage, the court charged as follows :

" By the law then in force an alien was incapable of taking land by purchase, and a sale of land to an alien and non-resident was a nullity. Upon this question you are instructed that the recitals contained in the grant to Tacitus Clay may be read in evidence, but are not conclusive proof of the facts therein recited, in any controversy not in relation to the particular tract of land embraced in the grant; and the jury must determine from all the facts and circumstances given in evidence before them, whether the defendant, Tacitus Clay, was or was not an alien and non-resident of Texas. "

The last paragraph of the charge was as follows : " The payment of $80 mentioned in the bond, signed by Nestor Clay, is acknowledged by the plaintiffs to have been made as stated.

But if you should believe from the evidence, that there were other conditions annexed to the contract, and that they were conditions precedent, to be performed before the title should pass, then the defendant must prove a performance of the conditions before he can demand a title.

Thirty-one charges were asked by the plaintiffs, all of which were given, four of them relating to the conditions supposed to have existed in the sale. The last two were as follows : " 30. If it was a sale upon conditions to be performed before the title vested, it does not matter how hard or impossible to perform, the conditions might be; the defendant took no right under it until he had performed the conditions. "

" 31. If the evidence shows that the sale was made upon precedent conditions, it is not necessary for the plaintiffs to prove that they were not performed; the defendant must show that they were performed, in order to maintain his title under such sale. "

The 29th charge asked and given was, to the effect that if the jury believed from the evidence that Nestor Clay made a valid sale upon conditions, " the defendant can acquire no right under such a contract, unless he has shown that he complied with all the conditions of it. "

Twelve of the charges asked by the plaintiffs, and given, related to the alienage of the defendant, and his domiciliation abroad. Two of these charges were as follows :

" 4. If the plaintiffs have shown that the defendant was born in the State of Kentucky, and was a citizen thereof, then the burden of showing that he afterwards removed to Texas, and became domiciliated there, before the death of Nestor Clay, in 1835, is upon the defendant; and, in the absence of proof, you should find for the plaintiffs, on that issue. "

" 5. The grant from the government to the defendant in 1833, of lands on the Navidad, does not establish his citizenship in this controversy. "

The defendant asked twenty-eight charges, all of which were refused but three, and two of the three were given with qualifications.

The second charge asked by defendant and given with a qualification, was as follows :

" If the jury believe from the evidence that Nestor Clay sold the land to defendant and put him in possession of the same, before the 26th of March, 1834, and that after that date the said Nestor recognized and acknowledged defendant's title to the land, and consented to a survey of the same for defendant, and permitted defendant to remain in possession, and by himself or his agents, to make valuable improvements, claiming it as his own, then such acts on the part of said Nestor ratified and confirmed the title of defendant, and rendered said sale valid and binding on said Nestor, and on his heirs, the plaintiffs in this suit. "

This charge was given with this qualification : " But if the evidence shows the contract to have been executory, and on conditions, then the defendant must show that the conditions were complied with, before that result would follow, and he must also prove that he was a citizen of Texas prior to the death of Nestor Clay. "

Two of the charges asked by the defendant and refused by the court, were as follows :

" 26. If the jury shall believe that there were conditions coupled with the sale of the land, at and before the date of the title bond, in 1830, still, if the jury shall further believe

that afterwards, Nestor Clay, on and after March 26, 1834, and up to the date of his death, put Tacitus Clay in possession of the land, had it surveyed, and allowed defendant to expend his labor and money in putting valuable improvements on the land, then the jury have a right to presume that all such conditions had been waived or complied with, and the heirs of the said Nestor cannot now take advantage of what their father had waived ; and if the jury should believe that Nestor Clay sold the land to Tacitus and put him in possession ** and after March 26, 1834, allowed Tacitus to remain in possession *** and up to the time of his death, stood by, and allowed defendant to expend his labor and his money in making valuable improvements on the land, under the belief that his title was good, then the heirs of Nestor Clay are estopped from attacking defendant's title.

"27.  When a contract is reduced to writing, it is presumed in law, that all the stipulations of the contract were included in the writing; and if the jury believe that Nestor Clay sold the *** land to ** defendant, and that the title bond in evidence was executed in pursuance of the contract, then the law presumes that all of the contract was included in the writing, and the jury will look alone to the title bond to ascertain what the contract was."

Tacitus Clay married in Kentucky, in 1839, and the proof of his alienage consisted of his acts and declarations at various times, from about the year 1835 up to 1846, when he brought his family to Texas, and settled them upon the land.  In two deeds made by him in 1845 and 1846 to lands in Kentucky, he styles himself a resident of the county of Davis, State of Kentucky.  Defendant objected to the introduction of the recitals in the deeds ; the objection was overruled, and he excepted.

The defendant asked charges to the effect that if he were a citizen of Texas in 1833 or 1834 it must be presumed that he remained a citizen until his abandonment was proved by clear and satisfactory evidence.

And further, that if defendant had purchased the land prior to March 26, 1834, and this purchase was ratified by Nestor Clay after that time, no subsequent abandonment of the country by defendant could vest title in plaintiffs.

These charges were refused.

The assignments of error, nineteen in number, present somewhat vaguely all the issues above mentioned, and some others which we have not thought it worth while to state.

The following is a copy of the title bond. The defendant alleged that his name was omitted by mistake:

"For and in consideration of eighty dollars in hand paid, the receipt whereof I hereby acknowledge, I bind myself, my heirs, executors and administrators to convey, and at any time when demanded, to give possession to a quarter of a league of land, on league on which I now live, beginning on the southeast line, which runs entirely in the prairie; thence to the back line, which runs northwest, running in the timber.

The plat of it is below. May 15, 1830.

[Signed]                                   "NESTOR CLAY."

"Attest:   JOHN COLM."

This instrument was proven by the subscribing witness, and recorded in 1839.

Opinion by Delaney, J.—Three distinct propositions were asserted by appellees in the court below, and appear to have been maintained by the judgment which is before us for review.

1. That the sale by Nestor Clay to Tacitus, in 1830, was prohibited by the laws then in force. It was therefore a nullity; it passed no title to the vendee, and is no bar to a recovery by the heirs of the vendor.

2. That the sale was made upon conditions precedent, and in the absence of affirmative proof by the defendant that he had performed those conditions, he could not hold the land against the claims of plaintiffs.

3. That at the time of the sale Tacitus Clay was, and for years afterwards continued to be, an alien, incapable of taking lands by purchase; and for that reason also he could not hold against plaintiffs.

We consider the question involved in the first of these propositions as effectually settled against appellees by the Supreme Court upon the two former appeals.

The court assigns a different reason for its ruling in each case, but the substantial result is the same.

We remark, further, that the decision of this question upon the two former appeals, can be fully sustained upon another ground not mentioned in either of the opinions, but we will only allude to it, as we consider this issue fully settled. Tacitus Clay is not a plaintiff seeking to enforce an illegal contract. He is a defendant in possession under a written agreement executed many years ago, the possession having been delivered by the vendor pursuant to the contract. Plaintiffs, as heirs of the vendor, are, in effect, seeking to rescind that contract, and oust the defendant from his long-continued possession, upon no other ground whatever than the illegality of the sale. They aver that their ancestor, in selling the land, violated a positive provision of the colonial law; that the sale was void and passed no title to the vendee; that the title remaining in their ancestor after the sale, descended to them, and hence they ought to recover. They do not pretend that Nestor Clay was a man of weak mind, or that he was overreached or defrauded by his brother. They present nothing to excuse or palliate his violation of the laws of his country, but they rest their right to recover solely upon the wrongfulness of his act. Counsel for appellees refer us to a number of cases in which our Supreme Court has refused to enforce these contracts, but to none in which they have been rescinded. Were these contracts absolutely null and void? We incline to think not. It is certain that our Supreme Court has always treated them as susceptible of ratification, and even of being specifically enforced upon equitable grounds.

In Stage v. McCallister, 18 Tex., 98, Justice Wheeler in speaking of these contracts, says: "It is unnecessary now to discuss the question whether this agreement was, to all intents and purposes, null, or was only so far inoperative and ineffectual, as that it could not be enforced unless it was validated by the grantor after the removal of the legal impediment; or unless there were supervening equities, which had the effect to make good the title in the purchaser. Whatever theoretical opinion may be entertained of the question, it cannot be denied that practically, the latter view of it has been maintained." (Citing, 1 Tex., 748; 9 Tex., 385; 14 Tex., 545.)

But appellees also maintain that the sale was made upon

conditions precedent.   We can see no merit in this part of the
case, but it is seriously urged by counsel.   It was made a
part of the general charge by the court below, and afterwards
repeated in such a variety of forms, in the shape of charges
asked by plaintiffs, that the jury must have thought it a mat-
ter of importance.   We will, therefore, consider the evidence
upon which it is based.

Upon the same paper which contains the written contract,
but below the signatures of Nestor Clay and the subscribing
witness, occur the following words.   We give them as they
are written:

"All my grand-maws two must  come out and all my aunts
two put that down all what mother says."

There is no signature to this latter writing, but counsel in-
sists that these words form a part of the contract of sale.   If
so, they must be taken as the words of the contracting parties,
and as written by Nestor Clay.   The words "Grand-maws,"
must, we suppose, be taken to mean grand-mothers, yet the
record does not show that they had, at that time, or after-
wards, either an aunt or a grand-mother living.

This is the written testimony.   In addition, two witnesses
testify that they once heard Nestor Clay tell his brother,
Tacitus, that he would give him a quarter of a league at
Hickory Point, if he would bring their mother to Texas, and
live there.

No time is mentioned when this proffer was made, nor any
circumstances to connect it with the sale; in fact, the witnesses
state that they heard nothing said about the sale.   Why this
testimony was not objected to, we do not know; but it amounts
to nothing, and a verdict found upon it must have been set
aside as being without evidence to support it.   For if we take
the written words at all, we must take them in their appro-
priate meaning.   And so taking them, we cannot see how the
declaration that an indefinite number of grand-mothers and
aunts must come out, can be construed into an objection upon
the part of Tacitus Clay, to bring to Texas the mother and
sisters of Nestor, nor can we see how the allegation of a
conditional contract of sale is supported by proof of a pro-
posal to make a conditional gift, when the latter is wholly un-

connected with the contract. We think, therefore, that the court erred in giving the charge in chief upon this subject, and also in giving those asked by the plaintiffs as well as in refusing those asked by the defendant. And we cannot know what influence this action of the court may have had upon the jury.

We come now to the question of the alienage and non-residence of Tacitus Clay, and upon the threshold of this inquiry we are confronted by the appellees with the following propositions—"The decisions of this court in this case upon the question of title, as affected by the alienage and non-residence of Tacitus Clay, at the time of his pretended purchase, and of the subsequent ratification of the same, is the law of this case, binding alike on the parties, the court below and the Appellate Court."

The general rule asserted in this proposition is doubtless founded in wisdom and sound policy; but it has not been implicitly followed by the courts of this State. (See Meyers v. Dittman, 47 Tex., 373; Layton v. Hall, 25 Tex., 204; Reeves v. Petty, 44 Tex., 254-5.) But supposing the rule to be correct, it applies only when there is substantially the same state of facts upon the last as upon the first appeal. (American Law Review, vol. 1, p. 612—cited by counsel.)

Upon the first appeal the question was decided upon a demurrer which admitted the alienage and non-residence of Tacitus Clay. The question which seems to have been decided by the court upon the first appeal was, could a non-resident alien take land by purchase under the colonization law of 1825?

The question now is, was Tacitus Clay in 1830, and at the death of Nestor Clay, such an alien and non-resident as to incapacitate him to take by purchase the land in dispute, and the further question, can the plaintiff, in view of all the facts and circumstances proven in the case, be heard to assert such incapacity? Whatever might be our views upon the question decided upon the first appeal we do not feel called upon to review that decision. We do not propose to discuss the laws and policy of Spain concerning foreigners; for in the case of Holliman v. Peebles, 1 Tex., and Yates v. Iams, 10 Tex.,

the learned Chief Justice Hemphill, after endeavoring in vain to explain the subject, abandoned the fruitless search and rested his decision in both cases upon the colonial laws of 1823.

But in the case of Yates v. Iams, 10 Tex., 169-70, he says that one of the methods by which a foreigner might acquire domiciliation was "that of attaching himself to the soil by purchasing and acquiring real property and possessions. Domiciliation is in most respects, equivalent to naturalization."

And after quoting a number of authorities he again says, (p. 70): From a review of the above, it appears that the acquisiton of real property and possession is a badge, or rather a conclusive evidence of domiciliation, or its equivalent naturalization." There were many reasons why Mexico, after her revolt from Spain, should abate much of the rigor with which the mother country had formerly treated foreigners. We need not delay to mention those reasons; but her liberal policy clearly appears in her colonization laws. In response to the invitation contained in the law of 1825, (Pasch Dig., Art. 563), Tacitus Clay came to the country as a colonist. He was received as such, and obtained from the government a grant of land as a colonist, very near the time at which he bought from his brother the land now in litigation. He brought to the country what must have been regarded, at that time, as a large amount of property—consisting of slaves, live stock, merchandise, drugs, medicines, arms, ammunition, etc. He introduced, and settled upon this tract of land, a number of immigrants, among them, a physician and a blacksmith—quite an accession, we may be sure, to this feeble, primitive settlement.

We take it that these facts are proof conclusive of his citizenship. Now, if he afterwards abandoned the country, the colonial authorities might declare vacant the lands which he had received from the State; but could his brother, or his brother's heirs, assert that, by reason of his abandonment, this tract of land reverted to them? If there be anything in the laws of Spain or Mexico which would sanction such pretentions on their part, it has not been pointed out.

In the case of Brown v. Hicks, Tex., 22 161, Justice Wheeler uses this language:

"That the grantee possessed all the requisite legal qualifications to entitle him to the grant; and that the grant itself concludes all after-inquiry upon that subject, has been repeatedly decided."

Counsel admit that in a contest with the colonist about the title to the land granted to him, the grant is conclusive; but they insist that in contests about other matters the grant would be only *prima facia* evidence, even if it amounted to so much as that.

But we know of no cases in which such inquiries have been allowed, nor can we conceive of any cases in which they should ever be allowed, except in a contest about the title to the very land granted.

In our earlier judicial history, an opposing claimant was permitted to question the validity of a colonial grant, upon allegation of fraud upon the part of the grantee in obtaining it.

The evidence was required to be brought forward within a reasonable time. But it would be strange, indeed, that a naturalized citizen should be compelled to prove his citizenship, by parol evidence, as well as by writing against all challengers, in all sorts of contests—and this, too, after an indefinite lapse of time.

If a foreigner was naturalized in this country to-day, surely no court would require him twenty years hence to produce any other than the written evidence of the fact.

After so long a lapse of time, every reasonable—almost every possible—presumption would be indulged in favor of the capacity of the defendant to take the land.

To show how our courts have treated the acts and adjudications of the former governments, we refer to the case of Holliman v. Peebles, 1 Tex., R. Holliman's title was vacated in 1830. The land was granted to Peebles in 1831. Holliman died in 1833, and his heirs brought the suit in 1840. In that suit they questioned the authority of the *ayuntamiento* to declare the land vacant, and Chief Justice Hemphill said, "This presumption will not, in this case, be

adduced in support of the action of the *ayuntamiento*, but a strong one arises in favor of their authority, from the long acquiescence of all the parties whose titles were annulled or affected by the proceedings.

"That redress could have been obtained under the former government against the illegal and unwarrantable proceedings of the inferior authorities cannot be doubted. Why this was not attempted has been left wholly unexplained."

In that case there was a delay of only seven years.

Here, Tacitus Clay bought in 1830, Nestor died in 1835 and this suit was brought in 1851. But it is alleged that the plaintiffs were minors. Their ancestor, however, was not. But even minority itself is not a perfect protection against that unalterable rule, inherent in all systems of jurisprudence, that long lapse of time fortifies possession, by lending to it every wholesome and healing presumption that it had a legal beginning.

In treating of a similar subject in a case where heirs sought to set aside a judgment of many years standing, and alleged their minority, Chief Justice Robertson used this language: "It does not appear how long the heirs labored under disabilities, but no disabilities which can be presumed to have existed should materially affect the point we are now considering, for the chief efficacy of the long lapse of time does not arise from actual or presumed acquiescence merely, but results principally from an inflexible rule of law, established for securing the repose of society, and founded on the presumption, sustained by the experience of mankind, that considering the nature of the fact attempted to be proved, the kind of evidence offered to prove it, and the obliterating influence of a lapse of more than twenty years, it is safer and more reasonable that the judgment should stand and long possession under it remain undisturbed, than that both should be assailed by testimony which, however false, the defendant could not be expected to repel." (4 Dana (Ky.) Reports, 422.) Under the circumstances of this case nothing but the clearest light and the most imperative duty could justify the court in overturning a title and ousting a possession older than the Republic itself. And certainly we cannot grope our way through the dim twi-

light, which has been shed upon the laws of Spain and Mexico, to such a result. In our opinion the plaintiffs should not be heard to question the capacity of the defendant to take, by purchase, the title to the land.

We therefore recommend that the judgment be reversed and the cause remanded.

Without intending to adopt fully all that is said in the opinion, we do concur in and adopt the conclusions reached in the opinion on each of the questions discussed. The judgment is accordingly reversed and the cause remanded.

ROBERT S. GOULD, Chief Justice.