C. H. McCORMICK & BRO. v. DAVID ARNSPIGER ET AL.

1. Until the passage of the non-intercourse acts by Congress in July, 1861, and the proclamation under said acts on sixteenth of August, 1861, commercial intercourse between citizens of Illinois and of Texas was not illegal.

2. The sale of property in Texas in May, 1861, by an agent residing in Texas, whose principal was residing at the time in Illinois, was not illegal as between such agent and the purchaser; and the principal, after the close of the war, can maintain his action for the agreed purchase money against such purchaser.

3. An agent in Texas, having property of his principal even after the non-intercourse proclamation, would be chargeable with a trust therein; and should he sell such property, the principal, at close of the war, could enforce such contract against the purchaser with notice of all the facts.

4. Payment to a Confederate States Receiver cannot be pleaded in satisfaction in a suit brought by the owner.

APPEAL from Grayson.     Tried below before the Hon. C. C. Binkley.

It appears that in 1861 C. H. McCormick & Bro. were engaged in selling their reapers and reapers and mowers in Texas, and that they had a number of them in the hands of John McKay, as their agent, for the purpose of sale.     It appears further that McKay had employed M. G. Bush as a sub-agent for McCormick & Bro. in said business.     That said Bush, as such sub-agent, in May, 1861, sold one of these reapers to Arnspiger, for one hundred and eighty dollars, warranting the machine at the time of sale.     That Arnspiger took possession of the machine at once, and,

upon trial, kept it. That Bush, being otherwise busily engaged, did not close the contract by note till October, 1861. That at that time there being a state of actual war between the United States and the States of the South—organized under the name of the Confederate States of America—which state of war had been formally recognized by both governments, Bush, for the interest of McCormick & Bro., and to avoid confiscation or sequestration by the Confederate States, took the note payable to John McKay, as if it were in his own right—McKay being a resident of Texas—this action of taking the note in the name of McKay being without the authority of McCormick & Bro. That afterwards Bush was required by the Receiver of the District Court of the Confederate States, under the sequestration laws of same, to deliver the said notes as the property of alien enemies, and the same were delivered to Patillo, the Receiver, and sequestrated and afterwards the said Patillo redelivered them to Bush, who held them subsequently by his authority.

After this Arnspiger voluntarily came forward and paid to Bush, in Confederate States notes, the amount of the note, and took possession of the same; he well knowing his payment was made for the benefit of the Confederate States, and that it was not made for the benefit of either McCormick & Bro. or of John McKay, the payee of the same.

Arnspiger, at the time he obtained the property, knew it was the property of McCormick & Bro.

After the return of peace, C. H. McCormick & Bro. proceeded to collect their assets in Texas, but found that many of the notes (if not all of them) had been given over to the Confederate States Receiver, and in this case the payee had got possession of his note from the Receiver, through Bush. Whereupon the plaintiffs brought this suit in the County Court of Grayson county, alleging that

the defendant had bought a reaper from the agent of Mc-
Cormick & Bro., and had executed a note ; also alleging
that he had obtained possession of the note without hav-
ing paid the same to McCormick & Bro., or for their ben-
efit, and asking that he be required to produce it.    To
this petition defendant answered, admitting the purchase,
setting forth the note and alleging its payment by him.

There were two trials in the county court, in the last of
which, October, 1869, the court gave judgment for plain-
tiffs for $309, and defendants appealed to the District
Court.    At the October term, 1870, of the District Court,
plaintiff amended his petition, alleging that there was a
mistake as to the time at which the reaper was purchased;
that the time really was May 10, 1861.

January 25, 1871, defendants filed plea in the District
Court that the plaintiffs were citizens of Illinois, and de-
fendants of Texas, at the time of the contract, and by
reason of the war between the United States and Confed-
erate States, the contract was illegal and could not be en-
forced.

May term, 1871, plaintiffs amended their petition, and
again alleged that the sale of the reaper occurred in May,
1861, instead of October 19, 1861, which had been alleged
by mistake.

Upon the facts as above given the court instructed the
jury to find for the plaintiffs, "unless they believed from
the evidence that at the time the note was made and de-
livered the plaintiffs resided in the State of Illinois and
the defendants in the State of Texas, in which event, in
order for the plaintiffs to recover, you must believe from
the evidence that the note was made      *      *      upon
a valid and subsisting contract, made by the parties with-
out any condition prior to August 16, 1861."

Instructions asked by plaintiffs were refused.

Verdict and judgment for defendants.

The errors assigned are :

1.　"The court erred in refusing to give the special charge asked by the plaintiffs, to the effect that if the jury believe from the evidence that the sale and delivery of the reaper was made before the non-intercourse proclamation of August 16, 1861, the sale and delivery were legal."

2.　"The court erred in its charge in fixing the 16th of August, 1861, as the limitation of legal contracts between the plaintiffs and defendant."

*Walton & Green*, for appellants, cited 2 Black, 870, The Prize Cases ; 2 Brightly's Digest, 193, 278.

*Joseph Bledsoe*, for appellees, cited 7 Wall., 557, Coppell v. Hall.

Ogden, P. J.—It may be gravely doubted whether the proclamation of the President of the United States, issued in 1861, declaring the blockade of certain ports, was intended to affect, or could have affected, the ordinary commercial relations of any portion of the citizens in the interior of the country.

The Congress of the United States were clearly of the opinion that no such effect could be attributed to that proclamation, since, on the 13th, and again on the 31st of July, 1861, acts were passed authorizing the President to declare, by proclamation, the inhabitants of certain States, or parts thereof, in a state of insurrection against the United States, and declares that upon the issuance of said proclamation, "all commercial intercourse by and between the same and the citizens thereof, and the citizens of the rest of the United States, shall cease and be unlawful so long as such condition of hostilities shall continue." The conclusion is, therefore, almost irresistible, that until the passage of these acts, and the issuance of the proclamation in pursuance thereof, commercial intercourse be-

tween the inhabitants of different portions of the country was not unlawful, unless carried on upon the high seas.

There was a marked difference in the rights and duties of citizens of foreign and independent nations, at the inception of the late war, and those which existed between the inhabitants of different portions of the United States, excepting in cases of an attempt to evade the blockade, and to violate some established law or usage of nations.

During the early part of the year 1861 there was, throughout the whole country, great excitement and confusion among the masses of the inhabitants, and but few, if any, appreciated or understood their relations to the general government, or to the citizens of any particular portion thereof. We think it may now be safely asserted, that if all opposition to the general government had promptly ceased, on the passage of the act of Congress, in July, 1861, or upon the issuance of the Presidential proclamation authorized by that act, no question would ever have been raised in regard to the legality of the domestic commercial intercourse of the different sections of the country.

The contract of sale, which is the subject matter of this suit, is proven to have been completed on the first of June, 1861, and the note was given simply as an evidence of that contract. Besides, it may be remarked that the note sued on bears no evidence of the illegal or treasonable character of the transaction, claimed by the defendant below. And in order to determine the legality or illegality of the contract, reference must be had to the time when the contract was actually made and consummated, which was in the spring of 1861. But was the contract, evidenced by the note here sued on, of such a character as would be considered illegal or treasonable at any time during the war?

In 1859 and 1860, and, indeed, up to the commencement

of the war, McKay was a citizen of Texas, but was the duly authorized agent of appellants, who were citizens of Illinois. As such agent he had accumulated a large amount of property belonging to appellants. When the war broke out it became unlawful for the people of Illinois and Texas to hold commercial intercourse, and as a necessary consequence the agency of McKay ceased. He could no longer represent citizens of Illinois for any purpose whatever, and must therefore have acted in his individual capacity. Certainly there was no law, municipal or international, which prohibited one citizen of Texas from selling personal property, of which he had the legal possession, to another, or from taking a legal obligation for the payment of the purchase money, during the continuance of the war.

A question as to who was the real owner of the property, and the note given for the purchase money, might have arisen between McKay and the Confederate States; but even that question could not have been raised by the appellees. Had McKay attempted to have run the property into a belligerent State, or have attempted to run the blockade with it; or even had he attempted to sell it to a citizen of Illinois, he might then have been chargeable with an illicit or treasonable commerce, and then the doctrine announced in the Prize Cases in 2 Black, or in Coppell v. Hall, 7 Wallace, might have been applied; but we are unable to discover the application of either of those decisions to the case at bar. Again, had the Confederate States succeeded in their attempt to establish an independent government, then the appellants might have been forever debarred from a recovery of their property, or the value thereof; but the Confederacy having failed, their rights in Texas, which were suspended during the war, revived, and they had a right to pursue their property, and the proceeds thereof, wherever they could find

it.   If the sale was made after the non-intercourse act of Congress, they certainly could not have made it, being in the State of Illinois; and as they could have no agent in Texas after that act, they are not chargeable with an illegal sale.  But if McKay had property of theirs in his hands on the passage of that non-intercourse act, though he could not control or dispose of it as their agent, yet he may, and should, be regarded as holding it in trust for their benefit, and his contract of sale may now be enforced by them.

Had the property been taken from McKay by the Confederate States during the war, and consumed or destroyed, in such case the appellants would have been without recourse; but it was sold to an individual, possibly without appellants' knowledge or consent.   When the purchaser gave his note for the purchase money, that note, both in law and equity, became the property of appellants, and they now have the right to enforce the payment.   There are no questions of equities of third parties having arisen since the making of the note; and though the same is, in terms, payable to McKay, yet it is in proof that he never claimed the ownership of the note, or the property for the purchase money of which the note was given, while the ownership is clearly established to be in appellants.

The defense, that the note had been confiscated and paid to the Confederate States, or its agent, cannot now be considered available for any purpose.   That defense was fully considered by this court in Luter v. Hunter, 30 Texas, 590, and in Levison v. Norris, 30 Texas, 713, and again in Levison v. Krohne, 30 Texas, 714, and finally decided and settled, that payment to a Confederate States Receiver did not discharge the debt.

Under this view of the law of this case we must decide that the court erred in its instructions to the jury, upon a

very material question, and that the erroneous ruling may and probably did mislead the jury. And for this cause the judgment is reversed and the cause remanded, to be proceeded with in accordance with this opinion.

REVERSED AND REMANDED.