## MANUEL SABRIEGO ET UX. *v.* SAMUEL A. WHITE.

The division of an empire works no forfeiture of the rights of property previously acquired.

The XIXth article of the plan of the provisional government reads as follows: "All persons who leave the country in its present crisis, with a view to avoid a participation in its present struggle, without permission from the alcalde or judge of their municipality, shall forfeit all or any lands they may hold, or may have a claim to, for the benefit of this government: *Provided, nevertheless,* That widows and minors are not included in this provision." (Paschal's Dig., p. 28, Note 128.) This was intended to retain the able-bodied men, or the effective force of the country; hence the proviso in favor of widows and minors.

Syllabus.

The 8th section of the general provisions of the constitution of the Republic
reads as follows: "All persons who shall leave the country for the purpose
of evading a participation in the present struggle, or shall refuse to partici-
pate in it, or shall give aid or assistance to the present enemy, shall forfeit
all rights of citizenship and such lands as they may hold in the Republic."
(Paschal's Dig., p. 36, § 8, Note 143.)   Parties who were resident in Texas
at the date of the revolution, and left the Republic in 1836 and 1837, and
did not return until 1847 or 1848, did not become aliens, nor, until the for-
feiture be ascertained by some proceeding authorized by law, is their civil
*status* changed, or their rights of property divested.

A party who left Texas in 1835, and went to Mexico, and resided there until
her death, in 1842, was not denationalized.  She was a citizen of Mexico
when she left, and she remained a citizen of Mexico, and the dismember-
ment of the empire worked no change of her right to land in Texas.   The
next paragraph seems to hold that she remained a citizen of Texas, and was
not subject to the declaration of the 10th general provision, that "no alien
shall hold land in Texas except by title emanating directly from the govern-
ment of this Republic."   (Paschal's Dig., p. 37, § 10, Notes 145, 147; Art.
43, Note 237.)

No length of absence from one's domicil, when the purpose is to return to it,
operates a change of domicil.

The clause of the constitution of the Republic which declared that no alien
shall hold land, &c., is to be taken in connection with the next clause, which
declares that, if any citizen shall die intestate, his children or heir shall
inherit the estate, and aliens shall have a reasonable time to take possession
of the same, in the manner to be hereafter pointed out by the law; and the
act of 18th January, 1840, gives nine years to the alien to assert his rights.
(Paschal's Dig., Art. 44, Note 238.)

This act (Art. 44) contemplated an inquest of office before the declaration of
forfeiture could be made.

Whether B, who left Texas in 1835, and remained in Mexico until her death
in 1842, was an alien Mexican, or remained a citizen of Texas, upon her
death, her land in Texas was cast upon her daughter, who accompanied the
mother to Mexico, remained there, and sued for the land as an alien and
Mexican citizen.

The principle illustrated by the doctrine of forced heirship, (Paschal's Dig.,
Art. 3868, Note 897.)

The 14th section of the act of the 28th of January, 1840, which was re-enacted
by the law of the 8th of March, 1848, to regulate descent and distribu-
tion, reads as follows: "In making title to land by descent, it shall be no
bar to a party that any ancestor, through whom he derives his descent from
the intestate, is or hath been an alien; and every alien to whom any land
may be devised or may descend shall have nine years to become a citizen
of the Republic, and take possession of such land; or shall have nine years
to sell the same, before it shall be declared to be forfeited, or before it shall
    xxx—37

escheat to the government." (Paschal's Dig.; Art. 44, Note 248.) This shows that the common-law rule that an alien cannot cast descent upon an alien was wholly inapplicable to the Republic of Texas; hence the court overruled the case of Sabriego v. McKinney, 18 How., 235.

Before the expiration of the nine years, Texas had been annexed to the United States, and we must look to the constitution and laws of the state for the rule governing the rights of aliens.

The case of Jones v. McMasters, 20 How., approved.

The 20th section of the VIIth article of the constitution of 1845 reads as follows: "The rights of property and of action, which have been acquired under the constitution and laws of the Republic of Texas, shall not be divested." (Paschal's Dig., p. 65, § 20, Note 197.) As no law of escheats has been enacted, no defense can be set up against the claim of an alien, upon the mere ground of alienage.

ERROR from Goliad. The case was tried before Hon. THOMAS J. DEVINE, one of the district judges.

The facts upon which the case turned are stated in the opinion of the court.

No briefs have been furnished to the *Reporter.*

LINDSAY, J.—This was an action to try title to one league and a half of land, granted in the municipality of Goliad, on the 6th day of August, 1833, to Gertrudis Barrera. The plaintiffs in error brought the suit against the defendant in error in the district court. They obtained a verdict and judgment in that court for one-half the land in controversy; but, believing themselves entitled to the whole, they have brought the case here by writ of error for the revision of this court.

The facts upon which the plaintiffs based their claim to the land are, substantially, about these: A concession was made by the executive of the state of Coahuila and Texas to Gertrudis Barrera for three leagues of land in sale, under the 13th article of the colonization law of said state, on the 28th day of April, 1832, and one league *gratis*, which was conceded in consideration of a previous settlement thereon, and the establishment of a ranch at the place,

when conceded, by Francisco Garcia, the husband of Gertrudis Barrera. They held, also, the grant from the state of Coahuila and Texas to Gertrudis Barrera, for one league and a half of land, in Goliad county, dated the 6th of August, 1833, which was founded on the concession of the 28th of April, 1832.

The plaintiffs in error were legally married at Goliad, in 1835, where they both then resided. The wife, Pilar, was the daughter and only child of Francisco Garcia and Gertrudis Barrera, to whom the land was granted.

Francisco Garcia died in the year 1834, at Goliad, where he and his wife, Barrera, then resided. After the death of Francisco Garcia, and after the commencement of the Texan revolution, but before the declaration of its independence, the mother, Gertrudis Barrera, the daughter, Pilar, and the son-in-law, Manuel Sabriego, moved to Matamoros, in Mexico, where the mother, Gertrudis Barrera, died in 1842, and the daughter and son-in-law have continued to reside in Mexico, ever since their removal from Texas, with the mother. The plaintiffs proved the identity of the one league and a half surveyed for and granted to Gertrudis Barrera by the state of Coahuila and Texas, in the county of Goliad. They also proved that the defendant had actual notice of the location and survey of Gertrudis Barrera as early as the spring of 1838; that the witness himself, who had been a chain-carrier of the survey, pointed out to the defendant the position of the northwest corner, where a post was planted; that the next day, when he again went to the place for the purpose of surveying north of this survey, he found the post had been taken up and removed; he hunted for it, found it, and restored it to its position, where it stood for years.

The defendant relied upon a survey made for White, on the 12th day of November, 1838, for twenty-four labors of land, interfering with plaintiffs' claim, upon which a patent issued by the state of Texas, on the 2d of April, 1852.

He relied, also, upon the alienage of the plaintiffs and the forfeiture of their title, if any they had, by reason of their removal from Texas and their adherence to the Mexican Government in the midst of or during the struggle of Texas for its independence.

Upon this state of facts, introduced before the jury, the court instructed them that if Gertrudis Barrera, the mother of the plaintiff, Pilar, died more than nine years before the commencement of this action, being an alien, and citizen and resident of Mexico, then the plaintiffs cannot recover more than one-half of the land sued for; and that the plaintiffs were entitled to recover one-half of the land in controversy, if the land had been granted to Gertrudis Barrera, the wife of Francisco Garcia, while they were man and wife, in 1833, and the plaintiff, Pilar, was their only child, and Francisco Garcia died in 1834, at Goliad, in Texas, before the commencement of the revolution.

The jury brought in a verdict for the plaintiffs for one-half of the land in controversy. A judgment was given in affirmance of the verdict, giving one-half the land, with costs of suit, to the plaintiffs.

Both parties moved for a new trial, but the motion of each was overruled; and each gave notice of appeal, but the appeal was not perfected by either; and the case is now brought up by writ of error before us, at the instance of plaintiffs, for revision.

The reasons assigned by the plaintiffs in error for a new trial, and which are the assignments of error for reversal in this court, are: That the court below erred in instructing the jury that, if they believed from the evidence that Gertrudis Barrera, the mother and ancestress of the plaintiff, Pilar, and the said Pilar, were citizens of Mexico, and that the mother died more than nine years before the commencement of the action, being an alien and citizen of Mexico, the plaintiffs could not recover more than one-half of the land sued for.

In the consideration of this case, upon the facts presented by the record, important questions arise and demand our examination. What was the effect of the revolution of Texas in 1836, and its separation from the parent government, upon the vested rights of its then citizens in the lands theretofore granted to them by the parent government? Did the political power which succeeded in establishing its independence of the supreme authority of Mexico adopt such measures as worked a forfeiture of the vested rights of its former citizens who adhered to the mother country? And are such citizens now barred, under any and all possible states of case, from the assertion of their claim to lands in our courts, so granted to them by the Mexican government before the revolution? These are grave and important inquiries, and involve matters of considerable moment to a class of claimants who acquired their rights in good faith, and which, therefore, appeal as strongly to the sense of justice of the judicial tribunals of the country as if they were citizens under the political jurisdiction of our own government. Their rights were acquired in the same manner as the rights of our own citizens, which were acquired anterior to the revolution, and, in the sense of public justice, ought to be equally as sacred. In the revolution and the separation of Texas from Mexico it was the division of an empire, and, under the conviction of that sense of public justice, all publicists and writers upon international law have maintained that the division of an empire works no forfeiture of the rights of property previously acquired. This principle of public law is justly recognized both by our own and the Supreme Court of the United States. If the plaintiffs in error, therefore, had such vested title in the land sued for, paramount and superior to that of the defendant in error, as an act of public justice that right or title ought to be protected, unless it be positively repugnant to and inconsistent with the new political organism of the dismembered portion of that empire.

After as full an investigation as we have been able to make of the political actions of Texas, as a republic and as a state of the United States of America, we have not been able to discover a single principle in her organization or in her legislative enactments which is repugnant to or inconsistent with the claim of the plaintiffs in error, or which divests the right conferred by the parent government.

It is apparent that the leading spirits of the revolution of Texas, who achieved its dismemberment from the parent government, were deeply imbued with a sense of justice to this class of claimants, from a provision which they engrafted in the provisional government, established by them on the 13th day of November, 1835, in article XIX, in which they say: "All persons who leave the country in its present crisis, with a view to avoid participation in its present struggle, without permission from the alcalde or judge of their municipality, shall forfeit all or any lands they may hold, or may have a claim to, for the benefit of this government: *Provided, nevertheless,* That widows and minors are not included in this provision." This interdict to emigration, with such a penal denunciation, was obviously intended to retain the able-bodied men, or the effective force of the country, to enable it to maintain the struggle successfully, and hence the proviso absolving widows and minors from the penalties of a forfeiture of all lands which they held, or might have a claim to.

In the 8th section of the general provisions of the constitution of the Republic a similar provision is inserted, with some change or modification, giving it prospective action, but without the proviso in favor of widows and minors. The language of the section is: "All persons who shall leave the country for the purpose," &c., shall forfeit citizenship and lands. Upon this section of the constitution of the Republic this court adjudged, in Kilpatrick v. Sisneros, 23 Tex., 115, that parties who were residing in

Texas at the date of the revolution, and left the Republic in 1836 and 1837, and did not return till 1847 or 1848, did not become aliens; and, if they forfeited their right to citizenship, and their title to their lands, yet, until the forfeiture has been ascertained and adjudged by some proceeding to be authorized by law for that purpose, their civil *status* was not changed, nor their rights of property divested. Certainly, then, the political power of the country did not intend to work a forfeiture of the land of widows who left even before or after the adoption of the plan of a provisional government, on the 13th of November, 1835. That article XIX, in the provisional government, was not only an authority, but an encouragement, for this class of persons to leave. It was founded in good policy; for it enabled the power struggling for a separate nationality to relieve itself of a class who added nothing to its material strength in the midst of its troubles and its difficulties, from the necessity of watching over and protecting them, and was a pledge of faith to them that they should not be prejudiced by a withdrawal from the arena on which the combatants were engaged, and that their rights should be preserved inviolate. It was, in effect, an invitation to them to leave, to save the nascent nation from the cares and the burdens of guarding and protecting a class who could add nothing to the effective force of the provisional government. The ancestress of the plaintiffs, therefore, cannot be presumed to have "left the country for the purpose of avoiding a participation in the struggle," when the liberty was thus expressly granted by the power in authority.

It could not, then, have been intended, in the contemplation of the constitution of the Republic, which was adopted on the 17th of March, 1836, only *four months and four days* after such liberty to leave was granted by the provisional government, to forfeit either the rights of citizenship or the lands held by this class of persons, as provided in the 8th section of the constitution of the Republic.

It did not denaturalize Madam Barrera, who left, by this public permission or implied sanction, in 1835, and remained absent in Matamoros until her death, in 1842. Whether it was her intention to return to the possession of her property or not, is not made manifest or disproved by any testimony in the cause. The presumption would be in favor of her purpose of returning. But, be that as it may, it must be remembered that she was a citizen of the Mexican government when she left Goliad, and was still a citizen of Mexico, in Matamoros, when she died. Her nationality was not changed, and the dismemberment of the empire of Mexico wrought no change in the rights of property which she had acquired in the dismembered portion of that empire. Her right, then, to the land was unaffected by the separation, and she continued the legal owner up to the period of her death. No act of the Texan government worked a forfeiture of either her right of citizenship or of the lands which she held under the 8th section of the general provisions of the constitution of the Republic, nor under the 10th section thereof, which declares that "no alien shall hold land in Texas except by titles emanating directly from the government of this Republic." There is no proof to show that it was not her intention to return and enjoy her rights under the new government, or that she had made an election to continue a citizen of Mexico. No length of absence from one's domicil, when the purpose is to return to it, operates as a change of domicil.

The only effect of the revolution and the establishment of the new government was to substitute that new government to the right of eminent domain within its territorial limits, without destroying or impairing private rights acquired under the displaced public authority of the original government. Her complete and perfect title to one moiety of the league and a half in controversy at the time of her death cannot be seriously questioned.

If, then, the title was complete in Madame Barrera in 1842, at the time of her death, whither did the title go when she died? If she had no heirs at law, or if there was no one who could take by succession, the common law having been adopted in the year 1840, the Republic would have become the inheritor of the estate, and would have taken it as an escheat. But, in order that the government may complete its title by escheat where there are no heirs, the government must do some act of its own to manifest publicly such claim or title; for it is the act of the government, coupled with the operation of law, that constitutes this title by escheat.

It is insisted that her daughter, being an alien, as conceded by the petition of herself and husband, cannot claim the inheritance, because the constitution of the Republic of Texas, adopted the 17th of March, 1836, declares that no alien shall hold land in Texas except by titles emanating from the government of this Republic. Yet, in that same section of the constitution, it provides, "that if any citizen dies intestate, his children or heirs shall inherit the estate, and aliens shall have a reasonable time to take possession of and dispose of the same, in the manner to be hereafter pointed out by law." The act passed under this constitutional provision, and for the purpose of carrying out this policy of the government, bears date the 28th of January, 1840, and prescribed that " every alien to whom any land may be devised or may descend shall have nine years to become a citizen of the Republic and take possession of such land, or shall have nine years to sell the same, before it shall be declared to be forfeited, or before it shall escheat to the government." (O. & W. Dig., p. 699, Art. 31.) This enactment obviously contemplated an inquest of office before the declaration of forfeiture could be made. No forfeiture of the right nor escheat of the property had accrued to the state at the time of the institution of this suit.

In whatever light we may consider Madame Barrera, the

original grantee of the land from the state of Coahuila and Texas, at the time of her death, whether as an alien, because of her native allegiance to the Mexican nation, which had never been changed by any positive law; or by any demonstrative acts of her own, or whether we regard her merely as a resident of Mexico, with the mind and purpose to return to Texas under the dispensation granted by the political authority of this new-born nation, her daughter, Pilar, must be regarded as her successor, and entitled to such rights of action and of property as her ancestress died possessed of.

The rights of the daughter, Pilar, accrued under the Spanish law. Her rights were vested *eo instanti* upon the emanation of the grant to her mother. By the law of Spanish succession her right to the inheritance of four-fifths of the estate was contemporaneous with the investiture of the mother with the title. She was in being at the time of the grant, and was the only child of her parents.

Under the Spanish law of forced heirship her right then accrued, which could not be divested by any alienation or disposition of the property by the parents, except as to one-fifth. After the establishment of the Republic this law of forced heirship was recognized and acted upon, and on the 18th of December, 1837, was formally enacted into a statute by the Congress of the Republic, and even as late as the 28th of January, 1840, this formal recognition was repeated by a second re-enactment, with a modification and a restriction of forced heirship to three-fourths, instead of four-fifths of the estate; subject, however, to a defeasance of the rights of the heir for certain culpable conduct in the act specifically set forth. [Paschal's Dig., Art. 3868, Note 897.] This last act was not repealed until the 24th of January, 1856, which entirely abrogated the law of forced heirship in the state of Texas. The only difference in the rights of the parent and child was, the one was the *jus in re*, the other the *jus ad rem;* the one the possession, use, and pres-

ent enjoyment, the other a right in abeyance for future use, occupation, and enjoyment, which might be well likened to the estate of a remainderman at the common law, where a particular or life estate has been carved out of the freehold.

The first statute of the Republic affecting the question of descents was passed the 18th December, 1837, as already mentioned, and that created an estate between husband and wife without children by survivorship. The next was the act of January 28, 1840, in which the Spanish law of forced heirship was established, with the modifications and restrictions already adverted to. The common law was not adopted until the 16th of March thereafter. The common law cannot, therefore, with any legal fitness, be resorted to as a medium, or adopted as a rule of interpretation for the solution of the principles or the development of the rights arising out of this policy of the civil law called forced heirship; the more especially when the very statute adopting the common law declares that the common law, together with the acts of Congress then in force, should be the rule of decision. Before the adoption of the common law, to what sources would the jurist resort to ascertain the character and nature and the principles of justice and right involved in this matter of forced heirship? There is no less necessity now than then to recur to its origin and its history to understand the civil rights created by it. The common law does not enlighten us upon it. By the statute of descents, then, which is one of the acts of Congress, together with the common law, declared in the act of 1840 to be the rule of decision, it is provided, that any person having title to an estate of inheritance, real, personal, or mixed, and dying intestate as to such estate, it shall descend and pass in parcenary, first to his or her children, &c., if any there be. The Spanish law was in force when this statute was adopted, and it would seem that the full import and meaning is to be arrived at in the light of the Spanish law. That law did not prohibit an alien from being an

heir, and taking by succession. If the statute is interpreted in the light of this law, then the plaintiff, Pilar, is not, in this case, subject to any disability from her alienage, and may take the inheritance from her mother, the original grantee of the land.

The statute of descents of the Republic of Texas, in force at the death of Madame Barrera, and not repealed until March the 18th, 1848, provided, that, in making title by descent, " it shall be no bar to a party that any ancestor through whom he derives his descent from the intestate is or hath been an alien, and every alien to whom any land may be devised or may descend shall have nine years to become a citizen of the Republic and take possession of such land, or shall have nine years to sell the same, before it shall be declared to be forfeited, or before it shall escheat to the government." [Paschal's Dig., Art. 44, Note 238.] This provision of the law shows, beyond all controversy, that the common-law rule, that an alien cannot cast the descent upon an alien, was wholly inapplicable to the Republic of Texas. Hence, we conceive that the decision in 18 Howard's Reports, p. 235, was pronounced under a total misapprehension of the state of the law in Texas at the time the rights of the plaintiffs accrued. At the death of Madame Barrera, in 1842, her daughter Pilar had nine years within which to assert her possessory claim to the inheritance of the use, occupation, and enjoyment of the land in controversy; in other words, to claim the *plenum dominium* over the property, which was only suspended during the life of the mother. Within that nine years a new form of government intervened, and the nationality of the Republic of Texas was merged in the nationality of the United States Government, and a new state constitution was adopted, and we must look to that instrument and the laws passed thereunder to ascertain whether any measures were adopted by this new political power which worked a forfeiture of the rights of the plaintiff, Pilar.

If our reasonings and conclusions are right in reference to the condition of the parties and the state of the law before the annexation of Texas to the United States Government, then this case may safely be rested upon the decision of Justice Nelson, of the Supreme Court of the United States, in the case of Jones *et al.* v. McMasters, 20 Howard's Reports, p. 17, in which are clearly presented the methods adopted by the new political organization for the protection of rights previously acquired under antecedent sovereignties of the same territory.

In that decision it is unequivocally assumed, that the division of an empire works no forfeiture of a right previously acquired, and that the "right exists in full effect, unless the new sovereignty created, within which the lands are situated, have taken some step to abrogate it. The title remains after the revolution and erection of the new government the same as before." The learned judge then quotes the 10th section of the constitution of the Republic, prohibiting aliens from holding land in Texas except by title emanating directly from the government of the Republic; and then quotes the 20th section of the VIIth article of the present constitution of the state, providing that "the rights of property and of action, which have been acquired under the constitution and laws of the Republic of Texas, shall not be divested," &c.; and also the 4th section of the XIIIth article, providing that "all fines, penalties, forfeitures, and escheats which have accrued to the Republic of Texas, under the constitution and laws, shall accrue to the state of Texas; and the legislature shall, by law, provide a method for determining what lands may have been forfeited or escheated."

No such law has been passed by the legislature of Texas to give effect to escheats for alienage, consequently no defense can be set up against the claim of an alien upon the mere ground of alienage. The plaintiffs, therefore, in this

case, are, in our judgment, entitled to their action for the recovery of the land in controversy.

2. There was another ground raised in the defense, and that is, that the defendant was a purchaser from the state and a locator without notice of the plaintiff's superior and paramount legal title. This mode of defense, although an equitable defense, is tolerated in our blended system, even in an action to try title, and the principles of both law and equity may be settled in the same action. This practice is authorized by express statute, and we are bound to regard it, however great we may consider its tendency to superinduce confusion in administrative justice, and to embarrass us in a just discrimination of the distinct principles of jurisdiction devised for the better security of the civil rights of parties. Upon this branch of the defense we think it is clearly manifest, from the proof in the cause, that the defendant was not a purchaser and locator in good faith, and therefore he cannot claim the protection of the court under such a *mala fide* acquirement of title from the state.

The plaintiff, Pilar, having inherited one moiety of the league and a half of land from her father, who died in Texas before the revolution, and who had never left the territory, her full dominion over that moiety accrued before she left for Mexico, and her right to it was complete on the death of her father, in 1834. We are therefore of opinion, that the judgment of the court below should be reversed, which is accordingly done, with instructions to order a new trial, to be conducted in conformity with the principles of this opinion.

REVERSED AND REMANDED.

MORRILL, C. J.—I concur in the result of the opinion in this case, but beg leave to dissent from the statements which disapprove of our system of pleading, and which give a preference to the common-law system.