Statement of the case.

## SAMUEL ANDREWS V. HEIRS OF JOHN SPEAR.

1. ALIEN HEIR MAY INHERIT LAND.—We are satisfied to follow the decision of Sittegast *v.* Schrimpf, 35 Tex., 323, and hold, that in 1852 the lands of an alien did not, upon his death, escheat to the State.

2. SAME—STATUTE CONSTRUED.—Such estate, however, is subject to escheat, on proceedings instituted by the State, if the heirs were aliens and failed to comply with the terms of the statute, which is as follows (Paschal's Dig., art. 44): "In making title to land by descent, it shall be no bar to a party that any ancestor, through whom he derives his descent from the intestate, is or has been an alien; and any alien to whom any land may be devised, or may descend, shall have nine years to become a citizen of the Republic and take possession of such land, or shall have nine years to sell, before it shall be declared to be forfeited, or before it shall escheat to the government."

3. FACT CASE—ALIENAGE.—See facts held insufficient to prove alienage.

4. PRACTICE.—The exclusion of testimony which is insufficient to establish the plea to sustain which it is offered, is no ground for reversal on appeal.

5. PLEA IN RECONVENTION—PARTIES.—Plea setting up that defendant holds by purchase of a vendee of plaintiffs, and asking a moneyed judgment against plaintiffs in event of their recovery of land sued for. The conveyance from plaintiff, a married woman, was not duly executed by privy examination, &c., and excluded: *Held*—

    1. On excluding the deed from plaintiff, the remaining testimony became irrelevant.

    2. That the plaintiff's vendor was a necessary party to relief for purchase-money paid, &c.

APPEAL from De Witt. Tried below before the Hon. D. D. Claiborne.

This suit was brought by the appellees, as the heirs of John Spear, to recover from Samuel Andrews a tract of land in De Witt county.

The appellant entered a disclaimer as to an undivided interest of two-thirds of the land, pleaded not guilty, and set up title in himself to an undivided one-third of the land, under a conveyance made to him by one James Mahood.

He further alleged that Mordecai Stubbins and his wife Mary, and Joseph Williams and his wife Elizabeth, who was the mother of the appellees, Eva M., Iona V., and Ernest M. Williams, about the year 1854, made an agreement with James Mahood, by which they agreed to give to him one-half of all the estate of John Spear which he might secure to them; that this contract was made in the State of Ohio, where all of the parties then lived; and that in pursuance of said contract, Mahood came to Texas and took charge of their business, and obtained the lands in controversy; and that in 1861, Stubbins and wife, and Williams and wife, to enable Mahood to get his compensation, conveyed to him the undivided one-third interest in the entire tract of land sued for. The deeds from them, however, were not executed in accordance with the statutes of this State providing for the conveyance of the separate property of married women.

He also alleged the inability of the parties to compensate Mahood in any other manner than by giving him a part of the land, or its proceeds.

He also pleaded the alienage of John Spear, through whom plaintiffs claimed. He further alleged that he paid to Mahood, for the land, about the sum of $850, one-half of the value of the land, and that the same was appropriated by Mahood in payment for his interest in the land, and in discharge of the contract between him and Stubbins and wife, and Williams and wife; and he prayed, in case the appellees recovered the land, that he have judgment against Stubbins and wife and .the children of Elizabeth Williams for the money so paid to Mahood.

The appellant offered to prove the contract made by Williams and wife, and Stubbins and wife, with Mahood, and that Mahood performed the services as alleged, which was .objected to, upon the ground that the same was irrelevant, .and the objection was sustained. He offered to prove the execution of the deeds to Mahood, which was objected to, upon the ground that the deeds had. not been properly exe-

cuted. This objection was sustained. He then offered to read in evidence the deed from Mahood to him, which was objected to and ruled out, upon the ground that Mahood had no title. He then offered to prove that he paid the money to Mahood as alleged, and that, under the order of the Confederate States court, he had paid the residue of the purchase-money to W. S. Glass, receiver, which was objected to, upon the ground that it was irrelevant, and the objection was sustained.

(The evidence offered and excluded, relied on as proof of alienage, is set out in the opinion.)

Verdict and judgment for plaintiffs. Defendant appealed.

*Philips, Lackey & Stayton,* for appellant.—John Spear bought the land in 1839, and it is probably true, if he was an alien at that time, that the sale to him by Lockhart was a nullity, on account of his incapacity to purchase. (Clay *v.* Clay, 26 Tex., 31; Holloman *v.* Peebles, 1 Tex., 719.) All laws in force at the time of the adoption of the Constitution of the Republic, and not inconsistent therewith, were continued in force. (Constitution of Republic, Schedule, sec. 1.) The provision of the Constitution of the Republic which declared that "no alien shall hold land in Texas, except by titles emanating directly from the Government of the Republic," was not inconsistent with the Mexican law before referred to.

No part of the Constitution of the Republic, nor of the act of January 28, 1840, repeals this prohibitory provision of the Constitution, or enabled an alien to hold land in Texas, unless the title thereto was derived directly from the government, or by inheritance from a citizen.

If the word "hold," as used in the constitutional provision, is to be construed as under the Mexican law, then the provision is prohibitory, and the deed from Lockhart to Spear was void and wholly inoperative, and the adoption of the common law by statute as the rule of the decision could not control.

If the word is used in the sense in which it would be under-

stood in a statute where the common law is the rule of decision, then John Spear could buy and enjoy until, by some proceeding upon the part of the State, such enjoyment was terminated.

The Constitution of the Republic declared that no alien should hold lands in Texas, except by titles emanating directly from the government. (Gen. Prov., sec. 10.) It further provided, that aliens might inherit from a citizen, and that they should have a reasonable time to take possession of and dispose of the same. Under these constitutional provisions, legislation was had, which provided that aliens should have nine years within which to become citizens, or to sell the land which they had inherited from a citizen.

The common law was adopted by the act of 20th of January, 1840, and its rule has ever been as enunciated in the Constitution of the Republic, if the word "hold" is to receive a common-law interpretation. John Spear came to Texas in 1840.

During the lifetime of John Spear, he, being an alien, could not have maintained a suit for the land, in the face of the constitutional prohibition. (1 Tex., 673; Yates *v.* Iams, 10 Tex., 174; White *v.* Sabriego, 23 Tex., 246.) All the rights which an alien had were derived from the Constitution and laws of the Republic, and, under the facts proposed to be proved, these conferred upon John Spear no rights whatever. (Barclay *v.* Cameron, 25 Tex., 244.)

While John Spear lived, he held the lands for the Republic, which might have enforced its claim at any time. (1 Blackst. Comm., 372; 2 Kent's Comm., 53, 54, 62; Jackson *v.* Adams, 7 Wend., 368.)

Upon the death of John Spear, if he could acquire and hold title against every person except the State so long as he lived, the lands escheated at once without office found. (2 Kent's Comm., 62; 25 Tex., 243; 4 Kent's Comm., 424; McKinney *v.* Saviego, 18 How., 238; Levy's Lessee *v.* M'Cartee, 6 Pet., 113; Fairfax's Devisee *v.* Hunter's Lessee, 7 Cr., 629; Bar-

rett *v.* Kelly, 31 Tex., 477; 7 Wend., 368; Mooers *v.* White, 6 Johns. Ch., 360.) From which it must follow that the appellees took no title by inheritance.

The Constitution of the Republic (Gen. Prov., sec. 10) provides: "But if any citizen of this Republic should die intestate, or otherwise, his children or heirs shall inherit his estate, and aliens shall have a reasonable time to take possession of and dispose of the same, in a manner hereafter to be pointed out by law."

This provision does not provide for the descent of the property held by an alien, even to a citizen; but simply provides that the property of a citizen may descend to an alien. (25 Tex., 244; 18 How., 239.)

The act of 28th of January, 1840, (Hart. Dig., 585,) which was reënacted 8th of March, 1848, (Paschal's Dig., 44,) does not in any manner alter the rule, but simply prescribes the terms upon which the alien heir may hold, and permits him to take by descent from the citizen through an ancestor who was an alien.

The proof offered by appellants making at least a *prima-facie* case of alienage, it would rest with the appellees to show that he was a citizen of the Republic.

Under the facts, no presumption of citizenship could be indulged. He stayed in Texas only about one year. In Blight's Lessees *v.* Rochester, 7 Wheaton, 535, Marshall, C. J., said: "The laws of Virginia requiring, as indispensable to his citizenship, that he should take the oath of fidelity to the commonwealth in a court of record, of which the clerk is directed to grant a certificate, we do not think that this fact, which, had it taken place, must appear on record, ought to be presumed, unless there were some other facts, such as holding an office of which citizens alone were capable, or which required an oath of fidelity, from which it might be inferred. * * * In favor of long possession, in favor of strong apparent equity, much may be presumed; but in a case where the presumption would defeat possession, where the equity is

doubtful, where the parties rely upon strict law, courts will be cautious how they lean in favor of presuming that which does not appear, and which might be shown by a record."

Residence in the Republic at the time of the Declaration of Independence, under section 10 of General Provisions of the Constitution of the Republic, made persons citizens; residence at any other time creates no presumption of citizenship.

Are the appellants estopped from setting up the alienage of John Spear, because they hold under deeds from those who claim to be his heirs?

We submit, that any person claiming under an executed deed, containing no conditions, holds adversely to all the world, and may deny the title of his vendor or any other person. This is sustained by the following authorities: Winlock v. Hardy, 4 Litt., 274; Voorhies v. White's Heirs, 2 A. K. Marsh., 28; Watkins v. Holman, 16 Pet., 54; 4 Id., 506; Croxall v. Shererd, 5 Wall., 287; Sparrow v. Kingman, 1 Comst., 242. In Osterhout v. Shoemaker, 3 Hill, (N. Y.,) 518, Bronson, J., said: "There is no estoppel where the occupant is not under an obligation, expressed or implied, that he will some time or in some event surrender the possession. The grantee in fee is under no such obligation. He does not receive the possession under any contract, express or implied, that he will ever give it up. He takes the land to hold for himself, and to dispose of it at pleasure. He owes no faith or allegiance to the grantor, and he does him no wrong when he treats him as an utter stranger. * * * If the plaintiff's deed was good, he has parted with whatever title he had. If the deed was void, he has neither lost nor gained anything by giving it. The parties stand where they were before."

The act of the 8th of September, 1871, (2 Paschal's Dig., 6829a,) does not establish any different or new rule. It simply determines what evidence shall be considered sufficient to make out a *prima-facie* case for the plaintiff, and provides the mode in which such proof may be made. Such proof being made, the plaintiff need go no further, unless such proof be

overthrown by evidence which the defendant may offer. The act imposes no limitation upon the right of a defendant to show that that which is claimed to be common source of title is no title at all.   *   *   *

II. Defendants should have been allowed to recover their purchase-money paid; citing Story's Equity Jur., sec. 696; Womack *v.* Womack, 8 Tex., 415; Hunt *v.* Turner, 9 Tex., 389; 7 Mon., 615; Howard *v.* North, 5 Tex., 316; 8 Dana, 183; 5 Ga., 356; 11 Ves., 535.

*Glass & Callender*, for appellees.—The alleged alienage of William Spear and of John Spear is the main defense relied on by the defendants below, and appellants here. Was it any sufficient defense to plaintiffs' suit?

I. If neither the Republic nor the State ever claimed the lands by escheat, can anybody else assert the right of the State against the plaintiffs? It will be conceded that William Spear and John Spear, even if aliens, could, while they lived, hold the lands until office found against them. William Spear lived until 1846; John Spear, until 1851 or 1852. Before the death of either, to wit, in 1845, the State of Texas ordained her first Constitution, and by it declared:

"All fines, penalties, forfeitures, and escheats which shall have accrued to the Republic of Texas under the Constitution and laws, shall accrue to the State of Texas; and the Legislature shall by law provide a method for determining what lands have been perfected or escheated." (Art. 13, sec. 4.)

In the case of Sabriego *v.* White, 30 Tex., 589,—which was a suit for land, where the defendant set up the alienage of the plaintiff,—this court said, in reference to the above section: "No such law has been passed by the Legislature of Texas to give effect to escheats for alienage; consequently, no defense can be set up against the claim of an alien upon the mere ground of alienage."

It had long before been held, that in case of "forfeitures"

the courts must await the action of the political authority before they can act; (Hancock *v.* McKinney, 7 Tex., 384; Swift *v.* Herrera, 9 Tex., 263;) and the decision in 30 Texas puts "escheats" upon the same ground as "forfeitures," in this regard.

The policy of Texas has never been in accordance with the common-law rule in regard to alienage. The Constitution of the Republic provided that aliens might hold land by title emanating directly from the government; (General Provisions, sec. 10;) that is, they could buy and locate land certificates, and obtain patents. The same section of the Constitution allowed alien heirs to inherit lands, and to have a reasonable time in which to take possession and dispose of the same. The acts of January 28, 1840, and of March 8, 1848, allowed any party to derive descent through an alien, and allowed to alien heirs nine years in which to become citizens, or sell their inherited lands. If aliens may be heirs, if descent may be traced through alien ancestors, it would have seemed strange if it had been held that we are bound by the other part of the common-law rule, and that an alien ancestor cannot cast descent; and hence it seemed reasonable that this court should say, as it did say in Sabriego *v.* White, *supra*, "that this provision of the law shows, beyond all controversy, that the common-law rule, that an alien cannot cast descent upon an alien, was wholly inapplicable to the Republic of Texas;" and that this court, in Settigast *v.* Schrimpf, 35 Tex., 344, should have reaffirmed this doctrine, and decided that case mainly upon it.

II. But suppose it were conceded that alienage might be a defense in a proper case, and that in a conflict in opposing titles it might turn the scale, was it competent in the defendants below to set up this defense in the case at bar? * *

III. If neither party has a valid paper title, the question then is upon the right of possession; and we insist that the prior possession of the plaintiffs gives them the better right, and is enough to enable them to recover against those who

entered without title, and who do not claim to have any title.

The authorities which sustain this position are numerous. The doctrine is stated, in Tyler on Ejectment and Adverse Enjoyment, p. 72, as follows:

" Although the general rule in actions of ejectment is that the claimant must recover upon the strength of his own title, this general principle has been so far modified, that when the owner of the true title neither objects nor consents to the possession of either party, the court regards the better right, as between the parties, to be vested in the first possessor, and grantees claiming through him. (Hubbard *v.* Barry, 21 Cal., 321; Busenius *v.* Coffee, 14 Cal., 91.) And when no legal title is shown, the party showing the prior possession will be held to have the better right. (Schultz *v.* Arnot, 33 Mo., 172; Wilson *v.* Palmer, 18 Tex., 592; Hutchinson *v.* Perley, 4 Cal., 33; Bequette *v.* Caulfield, Id., 278; Potter *v.* Knowles, 5 Id., 87; Turner *v.* Aldridge, 1 McCall C. C. R., 229; Nagle *v.* Macy, 9 Cal., 426; Bird *v.* Lisbros, Id., 1; Shumway *v.* Phillips, 22 Penn., 135; Tapscott *v.* Cobbs, 11 Grat., 172; Inns *v.* Nunn, 12 Ga., 469; Best on Presumptions, 87.) "

Waterman, in his late and able work on Trespass, states the same doctrine, in these words:

" Mere occupancy of land, however recent, gives the possessor a title against every one who cannot show a better claim, and is sufficient to maintain an action against a stranger. He who is in peaceable possession of land is regarded as the owner, except in a contest with one who has a better right." (2 Wat. on Tres., 246, 247, sec. 909.)

The authorities cited by the author in support of the position are very numerous. (See pages 346 to 354; and see same doctrine affirmed in 1 Smith's Lead. Cas., (Hare and Wall. notes,) 661.)

Among the cases cited by Mr. Waterman, is the Texas case of Christy *v.* Scott, decided by the Supreme Court of the United States. (14 How., 282.) In that case, the plain-

tiff sued to recover land of which he alleged his seizin and ownership, and that the defendant had entered upon the land and ousted him. The defendant pleaded, among other things, that the grant to the plaintiff, if any paper title he had, was dated September, 1835, and that the land was situated within the twenty frontier leagues bordering on the United States, and that the grant was invalid, because made without the assent of the national Government of Mexico. The court below overruled a demurrer to this plea, and the case was taken to the Supreme Court of the United States for revision. In regard to the plea above mentioned, that court said:

"According to the settled principles of the common law, this is not a defense to the action. The plaintiff says he was seized in fee, and the defendant ejected him from the posses-sion. The defendant, not denying this, answers, that if the plaintiff had any paper title, it was under a certain grant which was not valid. He shows no title whatever in himself. But a mere intruder cannot enter on a person actually seized and eject him, and then question his title, or set up an out-standing title in another. The maxim, that the plaintiff must recover on the strength of his own title, and not on the weak-ness of the defendant's, is applicable to all actions for the recovery of property. But if the plaintiff had actual prior possession of the land, this is strong enough to enable him to recover it from a mere trespasser who entered without any title. He may do so by a writ of entry, where that remedy is still practiced; (Jackson *v.* Boston & W. R. R. Co., 1 Cush., 575;) or by an ejectment; (Allen *v.* Rivington, 2 Saund., 111; Doe *v.* Reade, 8 East., 356; Doe *v.* Dyeball, 1 Moody & M., 346;) or he may maintain trespass. (Catteris *v.* Cowper, 4 Taunt., 548; Graham *v.* Peat, 1 East, 246.) Nor is there anything in the form of the remedy in Texas which renders these principles inapplicable to this case."

In the case of Tapscott *v.* Cobbs, 11 Grat., 172, it was held, by the Court of Appeals of Virginia, after a full review of the authorities, that where a party in peaceable possession

of land is entered upon and ousted by one not having title to the land, or authority to enter upon it, the party ousted may recover the possession in ejectment upon his possession merely; and his right to recover cannot be resisted by showing that there is or may be an outstanding title in another, but only by showing that the defendant himself either has title or authority to enter under the title. And that where an ancestor dies in possession of land, the presumption of law is that the heir is in possession after the death of the ancestor; and in the absence of all evidence on the point, the heir may maintain ejectment upon the strength of his possession against one who has entered upon the land without title or authority to enter under the title outstanding in another.

The same doctrine is maintained in many cases cited by the court in the case above mentioned, and especially by the able and well-considered opinion of the Kentucky Court of Appeals, delivered by Judge Marshall, in Sowder *v.* McMillan, 4 Dana, 456. In that case the learned judge reviewed the English decisions upon the point, (Bateman *v.* Allen, Cro. Eliz., 438; Rivington *v.* Allen, 2 Saund., 211; Read & Morpeth *v.* Ervington, Cro. Eliz., 322,) and stated his conclusion, that these "three cases, however strictly construed, established unquestionably the right of the plaintiff to recover, when it appears that he was in possession, and that the defendant entered upon and ousted his possession without title or authority to enter, and prove that when the possession of the plaintiff and an entry upon it are shown, the right of recovery cannot be resisted by showing that there is or may be an outstanding title in another." (P. 462.) The opinion further holds, that the alienee of the trespasser stands upon no better ground than his alienor. The learned judge also cited numerous Kentucky and New York decisions sustaining the doctrine that the plaintiff can recover in ejectment upon proof of naked possession for a time less than the period of limitation.

In the case of Schultz *v.* Arnot, 33 Mo., 172, the Supreme

Court of Missouri held, that where no legal title to the land is shown, the party showing prior possession will be held to have the better right.

In Inns *v.* Nunn, 12 Ga., 469, it was held, by the Supreme Court of Georgia, that a party plaintiff in ejectment may recover against a tenant who is in possession, without claim of title, upon his prior possession, even though he may have abandoned his possession, if such abandonment is made *animo revertendi;* and the court said:

"Possession is one, although the lowest, grade of title. It is *prima-facie* evidence of a legal title till some act is done by the rightful owner to divest this possession, and assert his title. Hence, as against one who can show no better title than naked possession, a plaintiff who has had prior possession may recover upon that possession. Being prior in time, and equal in degree with that of the defendant, it prevails against it." (P. 472.)

In McAlister *v.* Williams, 1 Tenn., 107, the Supreme Court of Tennessee held, that a defendant in ejectment who relied solely on possession, and showed no title, could not take exceptions to imperfections in the plaintiff's title.

In Waterhouse *v.* White, 2 Tenn., 334, the same court, after mature deliberation, held, that a defendant in ejectment who showed no title, but relied on possession, could not be permitted to go into proof to show that a mesne conveyance, under which the plaintiff claimed, and which had been proved and registered, was a forgery.

In Hanna *v.* Renfro, 32 Miss., 125, it was held, that if the ancestor die in possession, (holding under a defective deed,) the descent is cast upon his heirs who remain in possession after his death, and it is *prima-facie* title, sufficient to enable them to recover the premises in ejectment.

In Brown *v.* Colson, 41 Ga., 42, it was held, in an action of ejectment, by heirs at law, that proof that the ancestor died in possession, and that the premises were assigned to his widow as dower, and that she is dead, make a *prima-facie*

case which entitles the plaintiffs to recover, unless the defendant shows a title in himself.

GOULD, ASSOCIATE JUSTICE. — The questions mainly discussed by counsel for appellant grow out of the alleged alienage of John Spear, at the time (1841) when the land in controversy was conveyed to him, and at the time of his death, in 1852.

The Constitution of the Republic says: "No alien shall hold lands in Texas, except by titles emanating directly from the Government of this Republic." (Gen. Prov., sec. 10; Paschal's Dig., p. 37.) We are aware of no decision to the effect that under this constitutional provision a conveyance of land to an alien was a nullity. On the contrary, it has been held, that such a conveyance was only voidable, and was valid to protect the alien in the enjoyment of the land until some proceeding on the part of the Republic against him. (Osterman *v.* Baldwin, 6 Wall., 123.)

So, whilst the rule of the common law was that an alien could not cast descent, and that on the death of an alien his lands would, without inquest or office found, escheat and vest in the State, and there have been decisions of this court from which it might be inferred that prior to the act of 1854 (Paschal's Dig., art. 45, *et seq.*) this rule still prevailed in Texas, we are aware of no decision under the fourteenth section of the statute of 1840, reënacted in the ninth section of the act of 1848, regulating descents, in which this harsh rule was actually enforced, and the claim of the heirs denied, because the ancestor was an alien. (Barclay *v.* Cameron, 25 Tex., 243; White *v.* Sabriego, 23 Tex., 246; Warnell *v.* Finch, 15 Tex., 169.) The section referred to is as follows: "In making title to land by descent, it shall be no bar to a party, that any ancestor through whom he derives his descent from the intestate is, or hath been, an alien; and every alien to whom any land may be devised or may descend shall have nine years to become a citizen of

the Republic, and take possession of such land, or shall have nine years to sell, before it shall be declared to be forfeited, or before it shall escheat to the government." (Paschal's Dig., art. 44.) It has been decided by this court, in a case where the alien died in 1853, whilst the statute was in force unmodified, and prior to the act of 1854 defining the civil rights of aliens, a case in which the question was directly presented, argued, and considered, that the common-law rule, that an alien cannot cast descent, did not prevail in Texas. (Settigast v. Schrimpf, 35 Tex., 323. See, also, Sabriego v. White, 30 Tex., 576.) The question having been thus decided, we are aware of no sufficient reason for re-opening the subject, for the purpose of inquiring into the correctness of that decision. It may be, that we would not, if it were an original question, be able to concur in that construction of the statute. If so, it certainly would have been with regret that we enforced a rule so harsh, where the heirs of the alien were, or had become, citizens of the United States. The course of events has long since removed all disabilities of alienage as to citizens of the United States, and has also led to the enactment of a statute which expressly authorizes an alien to "take and hold any property, real or personal, in this State, by devise or descent from any alien or citizen, in the same manner in which citizens of the United States may take and hold real and personal estate by devise or descent within the country of such alien." (Paschal's Dig., art. 46.) It, certainly, is not now the policy of our State to absolutely prohibit an alien from holding lands, or from transmitting them on his death. Under these circumstances, we are satisfied to follow the decision in Settigast v. Schrimpf, and hold, that in 1852 the lands of an alien did not upon his death escheat to the State, but descended to his heirs, subject to escheat, however, on proceedings instituted by the State, if those heirs were aliens, and failed to comply with the terms of the statute. The answer setting up the alienage of John

Spear constituting no defense, the court did not err in excluding evidence in its support.

It may not be amiss, however, to add, that the evidence offered was wholly insufficient to establish such alienage. John Spear, it appears from this excluded evidence, was born in Ireland, of Irish parents, who came with him to Ohio whilst he was a minor. After he was grown, he spent some years in Brazil, returned to Ohio, and thence, in 1840, came to Texas, where, in 1841, he acquired, by purchase, the land in controversy, and where he remained up to his death, in 1852. We think these facts create a presumption that he was naturalized. Under the Constitution of the State he was deemed a qualified elector, having resided in the State six months before the acceptance of the Constitution by the Congress of the United States. (Const., art. 3, sec. 2.) Even if his alienage had constituted a valid defense, the case would not be reversed, because of the exclusion of evidence which was wholly insufficient to support a verdict on that ground.

At his death, his heirs were a half-sister, Elizabeth, born in the United States, and married to Joseph Williams, a native of the United States, and the children of a deceased sister, Sarah, who were born in the United States—all living in the United States.

Besides the plea of alienage, there was another defense, in the nature of a cross-bill. Mrs. Williams having died, this suit was brought by her surviving husband and children, and the descendants of the full-sister, Sarah. This answer alleges that "about the year 1854, Joseph Williams and his wife Elizabeth, who are the father and mother of the plaintiffs, Eva M. Williams, Iona V. Williams, and Ernest M. Williams, employed one James Mahood to attend to the interest of the said Elizabeth in the estate of John Spear, deceased, in the State of Texas, as well as to attend to other business of the said Elizabeth in said State, and in consideration of said services agreed to give to said Mahood one-half of such property as he should secure to her, or to give to him one-half of the

proceeds thereof; that said Mahood, at great expense to himself, came to Texas and took out letters of administration upon the estate of John Spear, deceased, and attended to the same faithfully, whereby the lands in controversy were secured to said Elizabeth; that said James Mahood attended to other business for the said Elizabeth; that the said Joseph Williams and Elizabeth, his wife, were poor, and unable to compensate the said Mahood for his services, except through the property which should come to the said Elizabeth in the State of Texas; that in order to enable the said Mahood to secure his compensation for his services aforesaid, the said Joseph and Elizabeth Williams, about the month of February, A. D. 1861, conveyed the land now sued for to said Mahood by deed; that afterwards, the said Mahood conveyed the same to this defendant; that the defendant paid to said Mahood the full value and price of this land, to wit, about the sum of seventeen hundred dollars, one-half of which sum the said Mahood appropriated to the payment of his debt aforesaid; and this defendant prays, in case it should be adjudged that the plaintiffs have the better title to the land in controversy, that then this defendant have a judgment against them for his money so paid, or for such part thereof as may be equitable."

It appears, by the bill of exceptions, and seems conceded as a fact, that the deed from Williams and wife to Mahood was not acknowledged, as required to make it a valid conveyance of Mrs. Williams' estate, and for that reason evidence as to the execution of such a deed was excluded. The court thereupon excluded all evidence in support of the other averments of said plea as irrelevant. Rejecting, as we must do, the averment of the execution of a deed by Williams and wife, the remainder of the answer, or cross-bill, contains no averments showing a moneyed indebtedness of Williams and wife to Mahood, on which to base his claim to the relief asked for, to wit, a moneyed judgment. It sets up matters, also, to the investigation of which Mahood was a proper and necessary

party.   As the answer was totally defective and insufficient to authorize the relief asked for, it was rightly held, that evidence in its support would not be heard.

It is claimed, in appellant's brief, that he was erroneously precluded from proving the value of his improvements.   But the record does not show that there was any suggestion of improvements in good faith, or any evidence on that subject offered or excluded.

We see no error in the judgment, and it is affirmed.

AFFIRMED.