# JUAN ORTIZ et al. vs. T. P. De BENEVIDES et al.

### SUPREME COURT, GALVESTON TERM, 1884.

*Practice*—One of the plaintiffs, to an action of trespass to try title, being an alien, and deraigning such title as she had from a Mexican citizen who died in 1816, the court did not err in overruling the exceptions of the defendant which presented the question . Aliens so claiming can maintain actions for land in this State.

·*Pleading—Practice.*—It should appear in a replication or other pleading seeking to avoid the statute of limitations set up in the answer that the plaintiffs were married prior to the hostile possession relied upon by the defendants, for if they were minors then the statute of limitations would run from the dates of their respective subsequent marriages.

*Same.*—If the plaintiffs were all covert when the action was brought, and married before they attained their majority, but after the hostile possession attached, they could not tack disabilities and thus avoid the bar.

*Same.*—A pleading seeking to avoid a plea setting up the statute of limitations should state such facts as show that the statute could not have run. No such facts were stated in the cause.

Note in the opinion the rule regulating the operation of the statute of limitations in the case of married minor females.

*Evidence.*—Note in the opinion a collocation of evidence of title and adoption which, under the other facts in this case should have been permitted to go to the jury.

Appeal from Webb County.

*Showalter & Nicholson, and Gardner Ruggles* for appellants.

*McLane & Atlee* for the appellees.

. Opinion by Stayton, J.

The court did not err in overruling the exceptions of the defendants which presented the question of the right of one of the plaintiffs to maintain a real action, she being an alien. If she has title it is through inheritance from Jose Gonzales, who was a Mexican citizen and d'ed in 1816. It is regarded as settled in this State that aliens so claiming may maintain actions for land. Jones vs. McMasters, 20 Howard 20; Sabriego vs. White, 30 Texas, 576; Andrews vs. Spear, 48 Texas, 580.

The defendant pleaded the statute of limitation to which, there was no replication of such facts as would prevent the bar of statute. On the trial evidence showing coverture of the plaintiffs was introduced over the objections of the defendants. It is claimed that the averment in the petition that the plaintiffs are all *femes covert* and were married while minors, was sufficient to let in evidence of coverture.

If the same language had been used in a .replication to the plea setting up the statute it would not have been sufficient. It should appear in a replication or other pleading seeking to avoid the bar of limitation set up in the answer, that the plaintiffs were married prior to the hostile possesssion relied on by the defendants, for if they were minors then the statute would run from the dates of their respective subsequent marriages. The plaintiffs may all have been covert when the action was brought, and they each may have married before they were of age, yet their several marriages may have occurred after the hostile possession commenced. If so they could not tack disabilities and thus avoid the bar.

A pleading seeking to avoid a plea setting up the statutes of limitation should state such facts as show that the statute could not have run. No such facts were stated in the petition in this cause. If thus stated it would be sufficient, although not stated in a formal replication.

It appears in the statement of facts that Teresa P. De Benevides was born about the year 1819, and that she married about the year 1838. The possession through which defendants claim seem to have commenced as early as the year 1833. If so, on the marriage of the plaintiff named, the statute would have commenced to run, and although she may have been a minor in 1833, yet if her ancestor, through whom she claims, was then alive, unless under disability, the statute would then begin to run. .

Antonio Pisana Ramos first married in 1843 and by supplemental petition she alleged that she inherited from her mother, who was an heir of Jose Gonzales, in the year 1825. If this be true, even though she was a minor at the time of her first marriage in 1843, the statute then began to run, if there was an adverse possesson.

The other plaintiff married about the year 1865, and in the nature of things if the adverse possession under which the defendants claim commenced and has continued since the year 1833, it must have commenced long prior to her birth if she was a minor at the time of her marriage.

Thus it is seen that there was no pleading, setting up the facts necessary to avoid the pleas of limitation and evidence in relation thereto should have been excluded. Plaintiffs and defendants each claim through Jose Gonzales who is admitted to have had title to the land in controversy as early as 1807. The plaintiffs claim through

inheritance and the defendants through Guadalupe Sanchez, who was an ancestor of one of the defendants, and under whose descendants the other defendants claim by conveyances. The evidence shows that the defendants claim that by the will of Jose Gonzales, executed in 1813, the land in controversy was decreed to Guadalupe Sanchez.

It appears that Jose Gonzales died in 1816 childless, and it does not appear whether he left surviving mother or father. The evidence shows that Guadalupe Sanchez was raised by him and was a member of his family, she being a niece of his wife; and it further shows that from some time soon after his death she asserted title to the land in controversy through a paper which the witnesses designate the will of Jose Gonzales and that she so continued to do until her death, which occurred in the year 1860. There was much testimony tending to show the adverse possession held by the defendants, and those under whom they claim, as also their open assertion of rights.

The evidence tending to show that a paper once in the municipal archives and spoken of by witnesses as the will of Jose Gonzales, had been in some way lost or destroyed, was reasonably full.

There was also evidence tending to show that Guadalupe Sanchez and those who claim through her had paid taxes on the land during the most of the time since the county of Webb was organized, and that the claim of these persons to the land was open and must have been known to the plaintiffs and those through whom they claim.

Bartols Garcia, a man seventy-two years of age, gave his testimony by deposition, in which after stating that he had lived in Webb county for sixty-two years, during which time he had been for several years mayor of the city of Laredo, testified to having seen among the municipal archives the will of Jose Gonzales, and among other things had testified as follows : "The will stated that Dona Guadalupe Sanchez was the sole and only heir of Jose Gonzales. When I first knew these lands no one claimed them; when I was twelve or fifteen years old Dr. Andreas Fascias, husband of Dona Guadalupe Sanchez, claimed it as the property of his wife. This was about 56 or 58 years ago, she claimed it as the only heir of Jose Gonzales under his will. I never heard of any body else claiming said land. Guadalupe Sanchez is dead. Jose Gonzales lived in Laredo and he died in Laredo about the year 1816 or 1817. I saw the will of Jose

many of the old records. I have not seen it since. I do not know what has become of it, nor whether it has been lost or destroyed. The will stated in substance that Jose Gonzales not having had any children by his wife he had adopted Dona Guadalupe Sanchez as his sole and only heir. The relations of Jose Gonzales lived in Webb county, and were Jose Ma Antonio, Petra, and Clara Gonzales. These relations had means of knowing that Guadalupe Sanchez and those holding under her had possession because they all lived in the city of Laredo, Texas, and Jose Ma Gonzales of the relations mentioned, was alcalde of lands under the Spanish government and mayor of Laredo under the U. S. government. Guadalupe Sanchez was in possession of these lands during her life time." Refugio Benivides testified that he was sixty years old and had lived in Laredo since his birth, and that he knew Guadalupe Sanchez and her husband, Andres Farias, and the other members of the family. He then stated : "I knew the porciones Nos. 19, 20 and 21 (land in controversy) they used to be known as "Santa Barbos." In 1833 I used to go out there to the ranch with the children of Andres Farias to eat watermelons. Andras Farias claimed the lands at that time as the property of his wife, Guadalupe Sanchez, who inherited the same from Jose Gonzales by will of the said Jose Gonzales to her. The family of Andres Farias lived in Laredo at that time. I knew that Andres Farias held possession of said lands from 1833 until 1835, when I went to San Antonio where I lived five years. I have seen a will of Jose Gonzales to Guadalupe Sanchez. I saw it in the year 1859, when I was mayor of the city of Laredo; during that year Juan Farias came to me and asked me for a copy of the will. I searched the archives of Laredo in my office and found it and read it: it was signed by Jose Gonzales and two witnesses, dated 1813; it was written in Spanish, and was on stamped paper, and was dated in 1813, was signed by Jose Gonzales and a notary public (Escribano Publico) and the witnesses and had the seal of the (Escribano Publico) Notary Public, and was made before the (Juely Primery) first judge of the municipality. I do not remember the name of the notary or of the subscribing witnesses. Juan Salinas, secretary of the city, made a copy and gave it to Juan Farias. In Gonzales in the archives of the city of Laredo about the year 1855, and I think it remained there until the year 1862, when a company of soidiers made the city hall their quarters and destroyed a good·

the mayor's office of Laredo at that time was archived all papers pertaining to land whether by deed, devise or grant, from the time when Laredo was under the Spanish government. Andres Farias and his wife, Guadalupe Sanchez, were in possession of the lands now known as porciones 19, 20 and 21 in the year 1833, under the will of Jose Gonzales, these lands were then known as Santa Barbosa, and they and their children and grand children have been in possession of the same ever since. They have always claimed said lands as the property of Guadalupe Sanchez, the wife of Andreas Farias, it has always been known in Laredo and Webb county that they claimed these lands. I never heard of anyone disputing their claim until the institution of this suit.''

The defendants proposed to prove by the witnesses the contents of the paper which they designated as the will of Jose Gonzales, and this was objected to upon the ground that it was not proved that the paper was executed as wills were required to be executed by the laws in force at the time, and this objection was sustained and the evidence excluded.

This ruling is assigned as error. The ground of objection to the form and manner of executing the paper which the witnesses speak of as the will of Jose Gonzales seems to have been that it was signed by two witnesses.

The paper in question, if intended as a will, was evidently intended as an open (aburto) and not a closed (cerrado) will, and it seems that such a will was required by the law then in force to be executed before a public (escribano) and these witnesses, inhabitants of the place; if the testator be blind five witnesses were required; and if there were no *escribano* five witnesses of the place were requisite, unless they could not be had, in which event three inhabitants of the place or seven strangers or non-residents were deemed sufficient to authenticate such a will, Whites Recopilacion, 98 Escriche. (Testamento aburto o nuncupatiro) 1 Alvarez Derecho Real, 212.

There seems to be some contrarity of opinion among Spanish jurists as to whether two witnesses and the public *escribano* could properly authenticate a will in case more witnesses could not be had. Upon this subject we insert a translation from Escriche. "May two witnesses and the notary be sufficient when more cannot conveniently be obtained in the place ? Don Juan Sala is in favor of the negative, basing his opinion upon the legal requirement of

three witnesses at least when a testiment is executed before a notaty public. However since the law, as above stated, is satisfied with three witnesses, when neither five witnesses or a notary can be procured, it would seem that when only two witnesses and the notary are present the three persons sought by the law are there, for the notary should be considered as at least one witness and such a one, although he were not a resident, as to be entitled to as much faith as a resident witness, being supposed to be well known in the district." Escrich, also observes (Verb. Testamento p. 1494) that "a notary cannot legalize (attest) a sealed testament in which he is instituted heir, because he acts in it as two witnesses." The length of time which elapsed after the date of the paper before its validity as the will of Jose Gonzales was never questioned, although those claiming under it have openly asserted title thereby, and had for a long time been, at intervals, if not continuously, in possession of the land, would be strongly corroborative of the fact that the views of the learned author and jurist were recognized as the true rule, upon this question in Mexico at the time the paper was executed, and were it necessary to do so in support of a claim so old and so continuously asserted without doing violence to what seems to us to be the spirit of the Spanish law, we might well adopt the views so well expressed, and after this lapse of time presume all such facts to have existed as would legalize the act of the notary public, and the two witnesses, if as matter of law these persons could attest a will.

There are, however, two other views of this question. While the witnesses speak of the paper as a will, yet its contents so far as developed by the evidence would tend strongly to show that it was an instrument by which Jose Gonzales adopted Guadalupe Sanchez.

The language of the paper was the most appropriate for such a purpose.

"The will stated in substance that Jose Gonzales not having had any children by his wife he had adopted Dona Guadalupe Sanchez as his sole and only heir."

Such institution of an heir might be by an instrument operating as a will, or by one establishing such legal relation between its maker and another as would make such other person the heir of the maker of the instrument.

To accomplish this latter purpose we have not found that it was necessary that the instrument through which the adoption is made

be a will. A learned Spansish writer states that in order to make a valid adoption it is sufficient that the father of the child to be adopted with the person adopting present themselves before some judge and declare that the one desires to give and the other to receive the child in adoption, and that there shall be given an instrument bearing evidence or the fact. 1 Alvarez Dericho Real 82.

In the case of Teal vs. Seveir, 26 Texas, 519, the act of adoption was executed in 1832 before a primary judge acting with two witnesses, and it was held to be effective to the extent of the disposable portion. The record bears evidence of the fact that Jose Gonzales had no descendants, and is silent as to whether he had ascendants. Such being the case it must be presumed that such a state of facts existed as would have authorized him to adopt and thus make Guadalupe Sanchez his sole heir. She had been reared in his house; was a niece of his wife, who is not shown to have been alive at that time, toward whom in his childless condition his affections would extend as do those of a father to his child. The act was one which ordinary affection under the circumstances would prompt.

Whether regarded as a will or an act of adoption, as evidence of title, proof of the contents of the instruments should have been permitted to go to the jury under all the facts in proof in the case. The instrument being in form such as stated by the witness even if it did not pass title to Guadalupe Sanchez, if presented should have been admitted, under all the circumstances, for the purpose of showing the boundaries to which the law would apply to adverse possession of the defendants and of those through whom they claimed.

The instrument having been lost, the witness, for the same purpose if for no other should have been permitted to state its contents. Charle vs. Saffold, 13 Texas, 109; Lambert vs. Weir, 27 Texas, 365.

The other matters covered by assignments of error relate to the giving and refusing to give instructions and to other matters which are not likely to arise on another trial and they need not be considered.

For the errors indicated the judgment is reversed and the cause remanded.